**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**STRATTON OAKMONT, INC., Defendant.**

**Civ. A. No. 94–2681 (JHG).**

United States District Court, District of Columbia.

Feb. 28, 1995.

---

Marc L.S. Mukasey, James P. Bodovitz, S.E.C., New York City, for plaintiff.

Luther Zeigler, Richard J. Morvillo, Crowell & Moring, Washington, DC, Ira Lee Sorkin, Squadron, Ellenoff, Plesent, Scheinfeld & Sorkin, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

On March 17, 1994, plaintiff, the Securities and Exchange Commission ("SEC"), issued an Order Instituting Public Administrative Proceedings, Making Findings and Imposing Remedial Sanctions in *In the Matter of Stratton Oakmont, Inc., et al.,* 1994 WL 91289 (1994) ("SEC Order"). The SEC Order, *inter alia,* mandated that an Independent Consultant ("IC") prepare a Report detailing policies, practices and procedures to be adopted by defendant, Stratton Oakmont, Inc. ("Stratton"), by a specified date.

The IC issued the Report on August 18, 1994. Stratton had to adopt the recommended policies, practices and procedures on or before November 18, 1994. It failed to comply. Stratton took the position that the

Report exceeds the scope of the IC's authority and that Stratton was therefore relieved of its obligations.

On December 14, 1995, the SEC instituted this action to enjoin Stratton from further violations of the SEC Order. The SEC also sought to have a Special Compliance Monitor appointed to ensure that Stratton did not violate the SEC Order in the future. This Court granted the SEC's requests for a temporary restraining order ("TRO") on December 19, 1994, and for a preliminary injunction ("PI") on January 11, 1995. Both of these orders required Stratton to comply fully with the SEC Order. Each time, however, the Court denied the SEC's requests for a Special Compliance Monitor.

Presently pending is the SEC's motion for a permanent injunction. In response, Stratton asserts that the motion is moot because Stratton has complied with the Report. It also asserts that the section of the Report entitled "Findings" should be stricken because it is not authorized by the SEC Order. For the reasons expressed below, the SEC's motion is granted, but portions of the Report will be stricken.

## I. *Background*

In March 1992, the SEC charged Stratton and its principals with various fraudulent acts and practices in connection with the offer and sale of securities to members of the investing public and with manipulation of one of those securities. *SEC v. Stratton Oakmont, Inc.*, 92–Civ–1993 (JES) (S.D.N.Y.). Almost two years later, Final Judgment by Consent was entered against Stratton which, *inter alia*, required the firm to pay over $2 million into a disgorgement fund and $500,-000 as a civil penalty.

To settle this earlier case and a related administrative proceeding (*In the Matter of Stratton Oakmont, Inc., Jordan Belfort, Kenneth Greene and Daniel Porush*, A.P. File No. 3–8321), Stratton consented to the terms of the SEC Order, which was issued on March 17, 1994. The SEC made findings and imposed sanctions with regard to Stratton and several of its principals.[1] As to Stratton, the SEC found that Stratton willfully violated federal securities law in that it:

> engaged in fraudulent sales practices, made baseless price predictions with regard to Stratton-recommended over-the-counter securities, made material misrepresentations and omissions concerning those securities and Stratton's experience and expertise in the securities industry, engaged in, encouraged and/or permitted unauthorized trading in Stratton customer accounts, and ... knowingly or recklessly manipulated the market price of the securities of Nova Capital, Inc. ... by dominating and controlling the market for Nova common stock and engaging in fraudulent sales practices.

SEC Order at 2. Stratton neither admitted nor denied these findings. *Id.* at 1.

After making its findings, the SEC ordered the appointment of the IC, who was to have "experience in broker-dealer compliance". *Id.* at 4. The staff of the SEC's Northeast Regional Office ("NERO") was to appoint the IC "upon advice and consultation with Stratton". *Id.* Stratton was to pay all of the IC's fees and expenses. *Id.* The SEC Order mandated that within thirty days, unless extended by the parties, the IC shall:

> a. complete a review of Stratton's policies, practices and procedures, including, but not limited to those policies, practices and procedures relating to [seven specified areas[2];]

---

1. Jordan Belfort and Kenneth Greene were barred from association with any broker, dealer, investment company, investment adviser or municipal securities dealer. SEC Order at 6–7. Greene was given the right to reapply after five years. Daniel Porush was suspended from acting in a supervisory capacity for one year and fined $100,000. *Id.* at 7.

2. The seven specified areas were: (1) Stratton's "use of written presentations in its solicitation of firm recommended securities"; (2) Stratton's "use of price predictions in soliciting purchases of firm recommended securities"; (3) "the RRs' authority for executing trades in customer accounts". An "RR" is a Registered Representative, who is a person engaged in sales practices on behalf of Stratton; (4) Stratton's "execution of unsolicited customer sell orders"; (5) "cold calling potential customers"; (6) Stratton's "'crossing' of trades in customer accounts and keeping customer funds 'under management'"; and (7) its responses to customer complaints. SEC Order at 4–5.

b. formulate appropriate policies, practices and procedures with respect to the matters set forth in [a.] above;

c. prepare a report which details the policies, practices and procedures specified in [b.] above (the "Report")[.]

*Id.* at 4–5.

The IC was to deliver the Report to the President of Stratton and the NERO. The SEC Order directed that "within thirty (30) days of Stratton's receipt of the Report Stratton shall adopt, implement and maintain any and all policies, practices and procedures set forth in the Report, or alternatives acceptable to the [IC] or the staff of the NERO".[3] *Id.* at 5. Stratton was also compelled to "retain an Independent Auditor to conduct four special reviews of its policies, practices and procedures" every six months for two years beginning six months after the Report issued. *Id.* at 5–6.

Carl H. Loewenson, Jr., Esq., was appointed as the IC on May 11, 1994. Mr. Loewenson, a partner in the law firm of Morrison & Foerster, was assisted by one of that firm's partners and two associates, as well as Mr. Allan H. Pessin of Securities Compliance Consultants, Inc., a man Mr. Loewenson considers an expert in broker-dealer compliance matters. The IC also consulted Judith Belash, who works with the compliance department at Goldman, Sachs, and other compliance specialists, including members of the National Association of Securities Dealers, Inc. ("NASD").

Mr. Loewenson and his staff conducted a thorough investigation with which Stratton fully cooperated.[4] In addition to meetings with Stratton and its counsel, the IC reviewed Stratton's files[5] and interviewed all of the firm's principals (some of whom are also RRs), eighteen non-principal RRs, seven cold-callers, the compliance staff, all former compliance directors and thirty-seven Stratton customers.[6] The IC and his staff also monitored telephone calls between Stratton employees and existing or potential customers for approximately twelve hours and observed the first day of trading of an initial public offering underwritten by Stratton. Finally, Mr. Loewenson visited the Lake Success, New York, office of Stratton six times and the Bethesda, Maryland, office once.[7]

The extensive nature of the investigation prohibited Mr. Loewenson from completing the Report within the required thirty-day period. As provided in the SEC Order, therefore, he sought and obtained the parties' consent to extend this deadline.[8]

Before he issued the Report, Mr. Loewenson had several meetings with the SEC staff, the NASD, Stratton's counsel and Daniel Porush, its President. The IC informed Stratton of the proposed Recommendations and described the factual basis for each. At no time, however, did he indicate that the factual support for the Recommendations would be published in the Report.

Mr. Loewenson ultimately issued the 95–page Report on August 18, 1994. Its first section, "Summary of Findings and Recommendations", provides a condensed preview of the Findings and Recommendations contained in the Report. Report at 1–3. Next, section II, the "Introduction", details the litigation history between Stratton and the

---

3. This was the only provision that provided any recourse to Stratton in the event it disputed any of the Recommendations. There was no provision in the SEC Order for Stratton to seek judicial or administrative review of the Recommendations.

4. The only resistance that Mr. Loewenson encountered was that one former Stratton employee declined to be interviewed on the advice of that person's counsel. This "minor" impediment was in no way attributed to Stratton.

5. The IC did not have subpoena power and some of the records he requested were claimed to be unavailable.

6. All thirty-seven customers were active customers when the IC began his investigation. He was, however, unsure as to whether they were all active customers at the time he issued his Report.

7. These are Stratton's only two offices. The number of visits is roughly in proportion to the number of RRs in these offices.

8. The parties were very accommodating to Mr. Loewenson's requests for extensions. At no time did he believe that either party would deny a request for a further extension.

SEC, and explains the manner in which the investigation was conducted. *Id.* at 4–9. Section III, the most controversial aspect of the Report, is entitled "Findings". This section explains the operations at Stratton, identifies the principals at Stratton and provides specific examples of improprieties at Stratton. Report at 10–63.

The final substantive section of the Report is part IV, "Recommendations", which sets forth the policies, practices and procedures Stratton was to adopt within thirty days of receipt of the Report. Report at 64–95. Stratton had to, *inter alia,* implement a system for taping all telephone calls made by RRs and sales assistants to and from customers, reduce the ratios of supervisory and compliance personnel to RRs to specified levels, modify its broker compensation system to remove what the IC considered inappropriate incentives and other improprieties, and institute a formal customer complaint process.

By prior agreement, the IC delivered the Report to Stratton's counsel rather than to Mr. Porush. Upon receipt, however, counsel did not forward the Report to Stratton. On August 23, Stratton's counsel notified the NERO that Stratton was taking the position that the IC exceeded his authority. Counsel did not believe that the IC had the authority to publish the Findings and claimed that the IC improperly made Recommendations that impacted Stratton's business decisions. Stratton's counsel demanded that the Report be returned to the IC and indicated that Stratton would not comply.

The SEC responded two days later that it expected Stratton to fulfill its obligations. On August 30, Stratton filed a Petition for Review with the SEC. At the same time, it requested confidential treatment for the petition and its exhibits. In response to these requests, the SEC indicated that there was no administrative review process available to Stratton and that the petition had not been accepted for filing.

In mid-September 1994, the IC met with Stratton's counsel to discuss Stratton's proposed alternatives to the Recommendations. Mr. Loewenson responded to Stratton's proposals by letter dated September 26, 1994; he accepted some and rejected others.

Stratton had thirty days from August 18, 1994 to implement most of the Recommendations and ninety days to implement the others. It failed to adopt a number of the recommendations. Stratton maintained that the Findings were not authorized by the SEC Order and that were Stratton to comply with the Report it would waive any objection it had to the Findings.

On December 14, 1994, the SEC instituted this action. It sought a TRO to force Stratton to comply with the Recommendations. In addition, the SEC sought the appointment of a Special Compliance Monitor to ensure Stratton's compliance. A hearing was held the next day. Stratton argued that this Court lacked jurisdiction because the SEC had not permitted Stratton to exhaust its administrative remedies. The Court rejected this contention and granted the TRO on December 19, 1994. Stratton was given until January 8, 1995 to comply with all of the recommendations. *See* Temporary Restraining Order (Dec. 19, 1994) at 9–10.

On December 21, 1994, Stratton filed a motion to modify the TRO. It asked the Court to postpone Stratton's obligations to install a taping system on its telephone lines and to revise its broker compensation scheme. This motion was promptly denied. Stratton made a similar request to the IC which was also rejected.

The SEC's motion for a PI was heard on January 9, 1995, the day after Stratton was to have complied with every Recommendation. Stratton, however, had not even attempted to comply in all respects. Most notably, Stratton never installed a taping system.

The Court issued a PI on January 11, 1995. Stratton was again required to comply with all of the Recommendations. Mr. Porush was also required to submit an affidavit on or before January 25, 1995 detailing the steps taken by Stratton to comply with the PI and indicating that Stratton had complied fully with the PI. *See* Preliminary Injunction (Jan. 11, 1995) at 5.

Mr. Porush filed the required affidavit. He indicated that Stratton had fully complied with the SEC Order, the TRO and the PI. Stratton asserted that the SEC's request for a permanent injunction was now moot. The SEC countered that the affidavit was deficient and, therefore, that the permanent injunction was not moot.

## II. *Discussion*

■ When the government seeks an injunction, "the standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief". *Hecht Co. v. Bowles*, 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); *see SEC v. Unifund SAL*, 910 F.2d 1028, 1035–36 (2d Cir.1990). The SEC's burden of proof, therefore, differs from that of a private litigant. If a defendant has violated federal securities laws [9], the SEC is entitled to a permanent injunction "if the court determines there is a reasonable likelihood that [the defendant] will violate the laws again in the future." *SEC v. Bilzerian*, 29 F.3d 689 (D.C.Cir.1994); *see SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C.Cir.1989) (SEC must show "that there [is] a *reasonable likelihood* of further violation[s] in the future") (quoting *SEC v. Savoy Indus.*, 587 F.2d 1149, 1168 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (quoting *SEC v. Commonwealth Chem. Sec. Inc.*, 574 F.2d 90, 99–100 (2d Cir.1978))). It need not demonstrate irreparable harm or an inadequacy of other remedies. *See Unifund SAL*, 910 F.2d at 1036.

■ A court should consider several factors to determine whether there is a "reasonable likelihood" that a defendant will violate securities laws in the future. These factors include "whether the violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law

in the future." *First City Financial Corp.*, 890 F.2d at 1228; *see Savoy Indus.*, 587 F.2d at 1168. The court must not examine any one factor in isolation, but should view the totality of the circumstances to determine the defendant's propensity for future violations. *See First City Fin. Corp.*, 890 F.2d at 1228; *see also SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984).

The underlying legal issues in this case are not complicated. It is not a typical SEC enforcement case in which the SEC must prove violations of the federal securities laws. The enforcement action was filed in 1992 and settled two years later. After lengthy and hard-fought negotiations, the parties *agreed* to the entry of the SEC Order, in which the SEC found—with Stratton neither admitting nor denying—that Stratton had willfully violated the federal securities laws. The SEC commenced this action because Stratton disregarded its obligations under the SEC Order.

Despite the simple legal issues in this case, Stratton's elusive behavior has rendered any meaningful analysis most difficult. Upon receipt of the Report, Stratton evaded its obligations by asserting that it would waive its right to object to the Report if it complied.[10] Subsequently, Stratton abandoned this argument and asserted at the TRO hearing that the Court lacked jurisdiction because Stratton had not exhausted its administrative remedies. The exhaustion argument was then forsaken at the PI hearing at which Stratton offered no justification for its failure to comply with the TRO and the order denying Stratton's request to modify the TRO other than that it was impossible to comply in the time provided.[11] In briefing the permanent injunction, Stratton deserted its previous arguments to assert that the matter was rendered moot by Stratton's full compliance with the TRO and PI. Stratton admit-

---

**9.** Although Stratton has steadfastly asserted that no court has found any violations of the federal securities laws, the SEC made such findings in the SEC Order.

**10.** Thereafter, Stratton obtained a written agreement from the SEC and the IC that Stratton's payment of the IC's fees did not constitute a

waiver of any challenges Stratton had to the Report. Stratton did not indicate why a similar agreement could not be reached with regard to its compliance with the Report.

**11.** Stratton ignored the fact that it had been fully aware of its obligations since August 18, 1994.

ted at the final hearing, however, that it failed to comply with the PI and that the Porush affidavit was inaccurate. It then assured the Court that the remaining deficiencies had been corrected on or before the morning of the hearing.

■ Notwithstanding its most recent assurances, Stratton's promises ring hollow given its history of noncompliance. This Court has no confidence whatsoever that Stratton will comply with the Report.[12] Stratton deliberately disregarded the SEC Order. It brazenly and intentionally defied this Court's TRO and order denying Stratton's request to modify the TRO. Thereafter, perhaps carelessly or inadvertently, it failed to comply with the requirements of the PI. In short, Stratton's conduct unequivocally demonstrates that there is a substantial likelihood that it will continue to evade its responsibilities in the absence of a permanent injunction.[13]

Stratton's contention throughout these proceedings was that it did not have to comply with the Report because it improperly included Findings. This position is entirely untenable. Nothing in the SEC Order even remotely suggests that Stratton could unilaterally delay implementation of the Recommendations.

The SEC Order states that:

within thirty (30) days of Stratton's receipt of the Report Stratton *shall* adopt, implement and maintain *any and all* procedures set forth in the Report, or alternatives acceptable to the Independent Consultant or the staff of the [NERO].

SEC Order at 5 (emphasis added). This language clearly requires Stratton to comply with every Recommendation unless it proposed an alternative acceptable to the IC or to NERO. This language cannot be interpreted to permit Stratton to ignore its obligations based on its position that the Report contained Findings.

■ The final issue is whether the Findings should be stricken from the Report. As previously noted, the SEC Order gives the IC the power to:

a. complete a review of Stratton's policies, practices and procedures, including, but not limited to those policies, practices and procedures relating to [seven enumerated practices] [ ("Subsection 'a' ") ];

b. formulate appropriate policies, practices and procedures with respect to the matters set forth in ... ["Subsection a."] above [ ("Subsection 'b' ") ].

c. prepare a report which details the policies, practices and procedures specified in [Subsection "b"] above ... [ ("Subsection 'c' ") ];

SEC Order at 4–5. In sum, Subsection "a" authorized the IC to review the past practices at Stratton. This review resulted in the information contained in the Findings. Subsection "b" instructed the IC to formulate appropriate policies for Stratton to adopt in the future with regard to the matters reviewed in Subsection "a". These policies became the "Recommendations". Finally, Subsection "c" required the IC to prepare the Report.

The IC understood this language to authorize publication of the Findings. Because his Recommendations had to be "appropriate", he believed that he had to include the factual underpinnings of his Recommendations. The IC also derived his conclusion by reading Subsections "a", "b" and "c" in concert. The Report, he stated, was to "detail[ ] the policies, practices and procedures specified in" Subsection "b". Subsection "b", in turn, instructed him to "formulate appropriate policies, practices and procedures with respect to the matters set forth in" Subsection "a". Thus, because Subsection "b" referred to Subsection "a", the IC believed that the inclusion of the Findings in the published Report was grounded in the language of the

---

12. In fact, were it not for the Independent Auditor, the Court would most likely appoint a Special Compliance Monitor.

13. Stratton's assertion that "the entry of a permanent injunction against Stratton may subject [it] to a myriad of (sic) state actions that will have draconian collateral consequences", Memorandum of Law of Stratton Oakmont, Inc. in Opposition to Plaintiff's Motion for a Permanent Injunction at 15, is not supported by any record.

SEC Order. Moreover, the IC also testified that he did not believe that the Report was complete in the absence of Findings and he surmised that Stratton's counsel would complain if there was no factual support for the Recommendations.

The Court agrees with the IC that the Report is more complete with the inclusion of the Findings. It is undeniably in the interests of justice for a litigant to understand the foundation for the actions taken against it. In fact, it is highly commendable that the IC devoted a substantial amount of his Report to explain why he took the actions he did. The Findings clearly assist in a determination that the Recommendations are, indeed, appropriate. In fact, in the absence of Findings, there is a strong possibility that Stratton would have asserted that many of the Recommendations lacked a factual foundation.

Nonetheless, just as Stratton is accountable for its mandatory obligations under the SEC Order, the SEC must similarly be held to the words of its bargain. *Cf. United States v. Western Elec. Co.*, 894 F.2d 430, 434 (D.C.Cir.1990) ("Construction of a consent decree is governed by ordinary principles of contract law"). Although the SEC Order can be construed to authorize the inclusion of Findings in the published Report, the better interpretation is that it does not. The Report was to "detail[ ] the policies, practices and procedures specified in" Subsection "b". Notably, Subsection "b" only addresses the policies with which Stratton should comply in the future. The IC's review of the existing policies, practices and procedures at Stratton (upon which his Findings are based) is authorized by Subsection "a". The SEC Order does not authorize the IC to *publish* the results of his Subsection "a" review of the existing policies, practices and procedures at Stratton in the Report; the reference to Subsection "a" in Subsection "b" is merely to the "matters set forth in" Subsection "a", *i.e.*, the seven enumerated areas of investigation.

Accordingly, the Findings and any other references in the Report to the Findings must be stricken from the Report before it may be released publicly. Nothing in this opinion, however, shall be construed by the IC as a license to modify the Recommendations (save for the deletion of any references to the Findings) or by Stratton as an excuse to fail to implement *all* of the Recommendations *forthwith*. To ensure that the Recommendations are "appropriate", the Findings shall be included in a sealed appendix which is not to be disseminated to the public.

### III. *Conclusion*

For the reasons expressed above, it is hereby

ORDERED that Defendant Stratton Oakmont, Inc., and its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with it who receive actual notice of this order by personal service or otherwise, and each of them, be and hereby are permanently enjoined from, directly or indirectly, violating the Securities and Exchange Commission's March 17, 1994 Order as set forth in the *Order Instituting Public Administrative Proceedings, Making Findings and Imposing Remedial Sanctions*, issued by the Securities and Exchange Commission on that date in *In the Matter of Stratton, Oakmont, Inc., Jordan Belfort, Kenneth Greene and Daniel Porush*, A.P. File No. 3–8321 [14]; it is

FURTHER ORDERED that, if the SEC or the Independent Consultant intend to disseminate the Report publicly, they must produce a new Report that does not include the Findings or any references to the Findings. The Findings may be included as a sealed appendix to the Report that is not to be released to any entity other than the SEC, the Independent Consultant, Stratton or Stratton's counsel absent the agreement of the parties; and it is

FURTHER ORDERED that all documents filed under seal in this action shall remain under seal.

IT IS SO ORDERED.

---

**14.** This, of course, includes the requirement that Stratton adopt all of the Recommendations contained in the Report of the IC dated August 18, 1994 *forthwith*.