SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

KENTON CAPITAL, LTD., Donald C.
Wallace, Jeffrey E. Carter, Deltaur
Partners, Harry Watson, Tracy L.
French, and Terry Plack, Defendants,

and

Atlantic Pacific Guarantee Corporation
and Charles Smith, Relief
Defendants.

Civil Action No. 95–0829(CKK).

United States District Court,
District of Columbia.

Sept. 30, 1998.

Larry P. Ellsworth, I, Securities & Exchange Commission, Division of Enforcement, Washington, DC, for Plaintiff.

Brian E. Maas, Ronald C. Minkoff, Beldock Levine & Hoffman, LLP, New York City, for Defendants.

Charles Smith, Santa Monica, CA, for Relief Defendants.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

This case involves alleged violations of the anti-fraud, securities registration, broker registration, and investment adviser registration provisions of the federal securities laws. The Securities and Exchange Commission ("SEC") filed an Amended Complaint stating five claims against Defendants Donald Wallace and Kenton Capital, LTD ("Kenton").[1] The First Claim charges Defendants Wallace and Kenton with violating section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5. The Second Claim charges Defendants with vi-

---

1. The Complaint also stated a sixth claim for relief, but neither Kenton nor Wallace were named in this claim. *See* Am. Compl. ¶ 39.

olating section 17(a) of the Securities Act of 1933, ("Securities Act"), 15 U.S.C. § 77q(a). The Third Claim charges Defendants with violating sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). The Fourth Claim charges Defendants with violating section 15(a) of the Exchange Act, 15 U.S.C. § 77o(a). The Fifth Claim charges Defendants with violating section 203(a) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–3(a). Currently pending before the Court is the SEC's Motion for Summary Judgment against Wallace and Kenton on all five claims.[2] Upon consideration of the entire record, and for the reasons outlined below, the Court will grant the SEC's motion as to all five claims.

## I. BACKGROUND

Kenton Capital, LTD ("Kenton") is an entity incorporated in the Cayman Islands, British West Indies. Wallace Dep. at 52–54.[3] Donald Wallace is Kenton's president. *Id.* at 62–63. Prior to his involvement with Kenton, Wallace worked for many years as a registered securities professional. *Id.* at 33–35.

In 1994, Wallace was interested in raising money through short term bank instruments. In February 1995, Wallace met Jeffrey Carter, who claimed to have experience with such programs. *Id.* at 73–78. After Carter introduced Wallace to some investors in the Cayman Islands, Wallace established Kenton and arranged for Carter to act as a consultant for the company. *Id.* at 99. As president of Kenton, Wallace was a signatory on Kenton's bank account and signed contracts on Kenton's behalf. *Id.* at 67, 69. According to Carter, Wallace made all of Kenton's decisions. Pl.'s Mot. Summ. J. Ex. 2 (Carter Dep. at 208).

On behalf of Kenton, Wallace and Carter began to search for trading programs and investors. From a hotel room in Little Rock, Arkansas, Carter contacted prospective investors about providing capital to Kenton. *Id.* at 151–52, 177, 271. Carter sent agreements to three investors, which described trading programs with projected returns of 3750% per week for forty weeks ("the Carter program"). *Id.* at 331–33; Carter Dep. at 74–76; Def.'s Opp. Ex. 17 ("Investment Agreement"). The agreements that Carter sent also ensured that the investment would be "returned to the investor no later than the end of the investment period" of one year and one day. Def.'s Opp. Ex. 17. Wallace signed these agreements, but he did not monitor Carter's representations to investors. Wallace Dep. at 271–72. Wallace has since stated that the projected profits were "not achievable," and that he had "no basis" for representing that they were achievable. *Id.* at 333–34.

During initial negotiations to raise capital, Carter arranged with Atlantic Pacific Guarantee Corporation ("AP") that AP would provide bonds as insurance for investments. Wallace Dep. at 112. Joseph Silvestri, a broker, gave Wallace a form of the bond and a copy of AP's financial statement. *Id.* at 114–15. Wallace also spoke to Charles Smith, AP's President, who provided Wallace with some additional information about AP's financial status. *Id.* at 117. Wallace reviewed AP's financial statements, which demonstrated that AP had sufficient assets to back the bonds. *Id.* at 118–19. Kenton did not determine whether AP was licensed to issue surety bonds, and, in fact, AP was not so licensed. Pl.'s Mot. Summ. J. Ex. 0 (McNamara Decl. ¶ 15). AP's financial statement, which Wallace reviewed, was not completed in accordance with accepted accounting standards, and reflected assets of only $176,057,931, not the "300 MILLION +" that Wallace represented to investors. Pl.'s Reply Exs. 22, AA (Atlantic Pacific Balance Sheet as of January 30, 1995;

---

**2.** All other defendants, except Jeffrey Carter, have submitted settlements. As for Carter, this Court previously granted summary judgment against Carter in favor of the SEC.

**3.** Excerpts of Wallace's deposition are located at Plaintiff's Motion for Summary Judgment, Exhibit 16, and at Defendants' Opposition, Exhibit A.

Barrett Decl. ¶ 4). AP and Smith are now without funds and cannot return money to investors. Pl.'s Reply Ex. 24 (Letter from Charles Smith).

Carter also contacted Harry Watson, who agreed to raise capital for Kenton through his company, Deltaur Partners. Watson Dep. at 248; Def.'s Mot. Summ. J. Ex. G (Agreement between Kenton and Deltaur). Watson and his partner, Tracy French, succeeded in bringing investors to Kenton. Watson Dep. at 248; Wallace Dep. at 160. Although Watson and French contacted investors for Kenton, Wallace did not monitor their representations. Wallace Dep. at 273–74.

In April 1995, Wallace and Carter met with Watson to discuss possible trading programs. Watson informed them that he believed Carter's program offering a 3750% return was "absolutely impossible" and would lose money. Watson Dep. at 167–70. Wallace then asked Watson to recommend a "safe program" for Kenton to use instead. Id. Watson suggested that Kenton contact John Silver, a trader that he knew in Germany. Wallace Dep. at 136. Wallace and Watson called Silver, and Silver proposed the following program ("the Silver program"): for $2 million, Silver would rent $100 million in U.S. Treasury bills, paying Kenton 7% per week and providing a bank guarantee on the principal. Id. at 138; Watson Dep. at 178–81. Silver would take the rented securities to a bank, borrow 90% of the face vale, and then trade the borrowed amount in offshore investments. Watson Dep. at 179–80; Wallace Dep. at 138–41. Wallace decided to use the Silver program, without making any due diligence inquiries into Silver or his company. Wallace Dep. at 139–45. Instead, Wallace relied on Watson's recommendation. Id. at 136–45. Watson had agreed to review Kenton's trading program, Watson Dep. at 119–21, 125, and Smith was also supposed to approve of any program or final investment decisions, Silvestri Dep. at 65–66; Wallace Dep. at 287–91.

After this meeting with Watson, Wallace revised the investment agreement that Carter had been sending to investors. Wallace Dep. at 227. Wallace sent investors a replacement contract, titled "Investment Advisor's Agreement." Pl.'s Mot. Summ. J. Ex. 12. Soon afterward, a third contract was sent to investors, which was identical to the Investment Advisor's Agreement except that the title had been changed to "Joint Venture Agreement," and instead of offering "specialist investment advice" the Joint Venture Agreement offers "specialist investment information." Pl.'s Mot. Summ. J. Exs. 12 and 13. These contracts did not specify a rate of return, and gave Kenton complete discretion as to how to invest the funds it collected. Id.

These new contracts were accompanied by a document describing the Silver program, titled "Asset Leveraging Opportunity." Pl.'s Mot. Summ. J. Ex. 10. The Asset Leveraging Opportunity proposed that Kenton would pool investments in order to invest $100 million or more in "Bank Instrument Trading Programs." Id. This would be accomplished when a "facilitator" leased U.S. treasuries at 2% per month, established an account with a brokerage house, and hypothecated the treasuries for 90% of their value. Id. Through this program, the facilitator could generate 7% profits per week, provided that investors pledged at least $100,000 in cash. Id. For every $100,000 invested, investors were promised $110,000 in profits per week for forty weeks. Id. Wallace has stated that, to the best of his knowledge, such profits have never been achieved by any trading program. Id. at 333–39.

The Asset Leveraging Opportunity did not mention any risks to investors. Pl.'s Mot. Summ. J. Ex. 10. The Joint Venture Agreement had a paragraph labeled "Risk," that acknowledged that programs offering high rates of return "must be balanced by the prospects that such returns may not be achieved." Pl.'s Mot. Summ. J. Ex. 13. The contract goes on to state that "The Joint Venture will ensure

that all Investment contracts which are entered into in respect of an investment will contain provisions assuring that there will be no financial risk to the Investor over and above the Investment Amount." *Id.* The agreement authorized Kenton to purchase an AP guarantee bond for the investor in order to ensure repayment within a year and a day. The contract relieved Kenton of responsibility for the performance of the bond and required the investor to investigate the bond company. *Id.*

The Joint Venture Agreement also provided that investors pay fees and costs to Kenton "from the Investment Amount." Pl.'s Mot. Summ. J. Ex. 13. These included a 10% finders fee, a 15% administrative fee, and costs for arranging leveraging. Id. Kenton also requested 50% of "any profits earned on the investment of the net proceeds of the Investment Amount." Id.

On the basis of these representations, over forty investors pledged to invest in Kenton's trading program. Pl.'s Mot. Summ. J. Ex. 3. The SEC claims that the Defendants actually collected $1,745,000 from twelve investors. Pl.'s Reply at 9. Defendants claim that they received only $1,695,000. Def.'s Opp. at 35. Defendants maintain that these investors came to Kenton and that no one affiliated with Kenton sought out investors. Carter, Watson and French claim that they only dealt with investors whom they believed had prior experience with bank instrument trading programs. Watson Dep. at 322–30; French Dep. at 25–27.

On April 26, 1995, Kenton learned that the SEC was investigating its trading program. Def.'s Opp. at 14. At that time, Kenton had not yet entered a formal contract with a trader. *Id.* On May 3, 1995, the SEC obtained a Temporary Restraining Order prohibiting Kenton from transferring any funds, thereby halting the trading program. The TRO was issued, in part, because the Court found good cause to believe that Defendants' funds would otherwise be transferred out of the Court's jurisdiction. *See* Temporary Restraining Order of May 3, 1995. This matter is now before the Court on the SEC's Motion for Summary Judgment against Defendants Kenton and Wallace.

## II. DISCUSSION

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The adverse party's pleadings must evince the existence of a genuine issue of material fact. *See id.* at 247–48, 106 S.Ct. 2505. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party. *See id.; Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987). Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial. *See id.* at 1248–49. The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## A. First and Second Claims: Violation of the Anti–Fraud Provisions of the Federal Securities Laws

██ Sections 17(a) and 10(b) establish very similar requirements for proof of se-

curities fraud. Section 10(b) of the Exchange Act, and Rule 10b–5 thereunder, prohibit the use of false and misleading statements, or any other deceptive or manipulative device, in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; *see also Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). Similarly, section 17(a) of the Securities Act makes it unlawful for any person in the offer or sale of any securities by the use of . . . interstate commerce (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact . . . or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q. The false and misleading statements must be material, and they must be made with scienter. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) (requiring scienter for proof of violations of § 10b, Rule 10b–5, and § 17(a)(1), but not for §§ 17(a)(2) or 17(a)(3)); *see also SEC v. Better Life Club of America, Inc.*, 995 F.Supp. 167 (D.D.C. 1998).

There is no dispute that Defendants engaged in the sale of securities using the instrumentalities of interstate commerce. Instead, Defendants claim that the SEC is not entitled to summary judgment on these claims because genuine issues of material fact exist as to whether Defendants made misrepresentations or omissions of material facts that induced people to participate in Kenton's trading program. Additionally, Defendants claim that the SEC has not shown that they acted with the requisite scienter. The Court will address each of these arguments in turn.

**(1) Misrepresentations or Omissions of Material Facts**

The SEC alleges that Defendants misrepresented or failed to inform potential investors about four material facts: (1) the risks associated with the investment; (2) the profitability of the investment; (3) Kenton's lack of due diligence about the programs being offered; and (4) the ability to "leverage" money by leasing Treasury securities. Pl.'s Mot. Summ. J. at 18–20. As a general rule, statements are material if reasonable investors would consider truthful disclosure of the information significant in making their investment decisions. *See generally Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). As Defendants do not contest the materiality of this information, the question is whether the SEC has demonstrated that one of these statements was actually false or misleading. *See Provenz v. Miller*, 102 F.3d 1478, 1484 (9th Cir.1996).

The Court finds that Defendants misrepresented the profitability of Kenton's trading programs. Kenton initially represented that investors would receive a return of 3750%. This figure was later revised downward to 110%. Defendants do not dispute that they made such representations, but argue that these projections were "appropriate and not misleading." Def.'s Opp. at 19. This Circuit has held that "projections and statements of optimism are false and misleading for the purposes of the securities laws if they were issued without good faith or lacked a reasonable basis when made." *Kowal*, 16 F.3d at 1277; *see also In re Donald J. Trump Casino Securities Lit.*, 7 F.3d 357, 371 (3d Cir.1993). In his deposition testimony, Defendant Wallace admitted that he had no basis for the 3750% return promised in Kenton's initial representations to investors.[4] Under *Kowal*, this constitutes

4. The fact that Wallace later revised this projection is irrelevant, as the above misrepresentations had already been made. Moreover, Wallace has stated that he "is not aware of any trading program that has ever has achieved its stated goals or that has paid its promised returns." Pl.'s Statement of Genuine Issues ¶ 19.

The Court also rejects Defendants' arguments that they were not responsible for these representations because they were made by Carter. Not only have Defendants admitted

clear evidence that these representations were false and misleading as a matter of law. *See* 16 F.3d at 1277.[5]

■ The Court also finds that the minimal boilerplate language contained in the Investment Advisor's Agreement, Asset Leveraging Opportunity, and Joint Venture Agreement failed to adequately disclose the specific risks associated with the investment. *See* Pl.'s Statement of Undisputed Facts ¶ 18. The Investment Advisor's Agreement and the Joint Venture Agreement contain identical paragraphs entitled "RISK," which state that

> The Investor hereby acknowledges that the Programmes offer potential high rates of return but inevitably the prospects of achieving high rates of return must be balanced by the prospects that such returns may not be achieved. The Joint Venture will ensure that all Investment contracts which are entered into in respect of an investment will contain provisions assuring that there will be no financial risk to the Investor over the Investment Amount.

Pl.'s Mot. Summ. J. Exs. 12 and 13. This appears to be the only information about risk that was provided to investors. *See id.;* Wallace Dep. at 269–70. The Court cannot agree with Defendants that this language is adequate. This so-called disclosure is not substantive, nor is it tailored to the specific and extravagant predictions contained in the rest of the document. Overly general information such as this is simply insufficient to alert investors to potential risks. *See Trump Casino,* 7 F.3d at 371; *SEC v. Infinity Group Co.,* 993 F.Supp. 324, 329 (E.D.Pa.1998); *SEC v. Hasho,* 784 F.Supp. 1059, 1109 (S.D.N.Y. 1992).

■ Finally, the Court finds that Kenton and Wallace failed to disclose Kenton's lack of due diligence about the trading program being offered. Securities dealers cannot recommend securities without a reasonable basis for the recommendation; if essential information is not known to a securities dealer, the dealer must inform investors that this information is unknown and must disclose the risks of such uncertainty. *See Hanly v. SEC,* 415 F.2d 589, 597 (2d Cir.1969); *Keenan v. D.H. Blair & Co., Inc.,* 838 F.Supp. 82, 89 (S.D.N.Y.1993). Since the duty to investigate acts as an "implicit warrant[y]" of the soundness of the investment, a failure to disclose facts relating to such an investigation is an omission of material fact. *See Keenan,* 838 F.Supp. at 89. The SEC has presented evidence, including Wallace's own sworn testimony, that Wallace did not inquire into Silver's background or his experience with trading programs, nor did he ask for any references from his clients, customer, or business associates. Pl.'s Statement of Undisputed Facts ¶ 9. Wallace also failed to investigate which bank Silver would use, believing that Silver would provide this information later. Nor did Kenton investigate the AP bonding company thoroughly. Failure to disclose these facts constitutes a material omission that clearly violates the securities laws.

■ Defendants do not dispute that Wallace failed to do these things. Instead, Defendants claim that the need for such inquiry was obviated by the following facts: Watson recommended Silver to Wallace; it was the trading bank, not Silver, that was to provide the guarantee; and various individuals were to have approved the trading program before funds could be transferred. Def.'s Statement of Undisputed Facts ¶ 9. The Court is not persuaded that these facts relieve Defendants of their duty. A recommendation from a business associate and a promise that the program was to be evaluated after-the-fact

---

that Carter acted as Kenton's agent, but Wallace signed the contracts that Carter mailed to investors. Def.'s Statement of Genuine Issues at 11.

5. Even if the Court were to accept Defendants' argument that the replacement contracts corrected their original "mistake," Defendants have failed to allege any facts to contradict the SEC's allegations that the returns projected by the replacement contracts were also false, misleading, and made without any basis.

are no substitute for financial statements, opinions of counsel, good-standing certificates, third-party financial analysis, or other indicia of meaningful due diligence. *See Infinity Group*, 993 F.Supp. at 329–30. Failure to disclose this material information constitutes fraud.

## (2) Scienter

Having established that Defendants made several false or misleading statements about material facts, the only remaining issue is whether or not Defendants acted with the requisite scienter.[6] Scienter is established where representations or opinions are given without basis and in reckless disregard of their truth or falsity. *See Dirks v. SEC*, 681 F.2d 824, 844–45 (D.C.Cir.1982), rev'd on other grounds, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *see also SEC v. Bremont*, 954 F.Supp. 726, 730 (S.D.N.Y. 1997) (citing *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir.1978)). For Defendants to have represented such incredible returns without any basis and without believing that they were achievable is patently reckless behavior.[7] Fur-

thermore, Kenton's failure to conduct due diligence in connection with the program it was promoting indicates recklessness. Given Wallace's experience in the securities industry, this evidence is more than adequate to establish the requisite scienter. The SEC has demonstrated that Defendants committed securities fraud because they made material misrepresentations and omissions while engaged in the offer or sale of securities, with scienter. Since Defendants have not rebutted this evidence or otherwise raised any material factual issues, and the SEC is entitled to judgment as a matter of law, the Court grants summary judgment for the SEC on the First and Second Claims.[8]

## B. Third Claim: Violation of the Securities Registration Provisions of the Securities Act

The Third Claim of the Amended Complaint asserts that Defendants violated section 5 of the Securities Act, which requires issuers to register their securities with the SEC before selling or offering to sell such securities. 15 U.S.C. §§ 77e(a) and (c). Accordingly, the SEC must show that the

---

**6.** Defendants' assertion that the SEC must also prove that investors relied on Kenton's representations is incorrect as a matter of law. Reliance is an element of a private cause of action under the securities laws, but it is not an element of SEC enforcement actions. *See SEC v. North Am. Research and Dev. Corp.*, 424 F.2d 63, 84 (2d Cir.1970); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir.1993).

**7.** Defendants cite *SEC v. Steadman*, 967 F.2d 636, 648 (D.C.Cir.1992), in support of the proposition that the Court is precluded from finding scienter because they relied on representations of counsel that they satisfied the disclosure requirements. *See* Def.'s Opp. at 24 n. 5. A closer reading of the case, however, reveals that such reliance is a factor to be considered in determining the propriety of injunctive relief, not scienter. *See Steadman*, 967 F.2d at 648. Furthermore, Defendants refused to divulge either the substance of the communications with its attorney or the identity of the attorney during discovery. Courts that have recognized the defense of reliance on counsel have "required the defendant to establish that he (1) made a complete disclo-

sure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and relied in good faith on that advice." *SEC v. Savoy Industries, Inc.*, 665 F.2d 1310, 1314 n. 28 (D.C.Cir.1981) (citing cases). The Court cannot evaluate Defendants' claim without some indication of its substance.

**8.** Because the Court has identified various specific misrepresentations made by Defendants that constitute fraudulent conduct under the securities laws, the Court finds it unnecessary to reach the broad question of whether this trading program was ultimately viable. Some courts have held that trading programs like Kenton's do not exist. *See, e.g., SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir.1995) (holding that prime bank instruments "do not exist" and that sale of them is a "thoroughgoing, pure, and barefaced fraud"). Although the Asset Leveraging Opportunity refers to such bank instruments, neither the SEC nor the Defendants have developed an adequate factual record to support a finding that this specific program does or does not exist.

investments offered are securities, and that the Defendants offered or sold these securities without first filing a registration statement. These elements are not contested by Defendants. Instead, the Defendants argue that their efforts are exempt from these registration requirements under section 4(2) of the Securities Act, 15 U.S.C. § 77d(2), or, in the alternative, under Regulation D, 17 C.F.R. §§ 230.500–506.

### 1. Section 4(2) Exemption for "Private Offerings"

■ Transactions by an issuer not involving public offerings are expressly exempted from the Securities Act's registration requirements. 15 U.S.C. § 77d(2). To determine whether an issuer's offerings qualify for this exemption, the Supreme Court has held that courts must examine whether allowing the exemption is consistent with the promotion of the "full disclosure of information thought necessary to informed investment decisions" and whether "the class of persons affected needs the protection of the [Securities] Act." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–25, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). Courts applying this mandate have identified various factors that should be considered in determining whether an offering is exempt under section 4(a): the number of offerees, the relationship of the offerees to each other and the issuer, the manner of the offering, information disclosure or access, and the sophistication of the offerees. *SEC v. Life Partners*, 912 F.Supp. 4, 10 (D.D.C.1996) (citing *Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984)). Defendants assert, and the SEC does not dispute, that the number of offerees was limited, and that the manner of the offering was not a general solicitation. The SEC does dispute, however, Defendants' claims regarding the sophistication of Kenton's offerees, and the offerees' access to information. The Court will consider these two factors in turn.

■ Defendants support their allegation that their offerees were sophisticated by evidence that they screened their offerees. Wallace testified that he developed a checklist of information that was required of all investors, which was included in the material that Kenton sent to investors. *See* Def.'s Statement of Genuine Issues at 28; Def.'s Ex. F ¶ 13 (Joint Venture Agreement); Wallace Dep. at 145. Closer examination of this list, however, reveals that the information requested therein consisted of a photocopy of the investor's passport, a copy of the investor's driver's license or social security card, and a bank reference showing the investor to be in good standing with a bank. This information is wholly irrelevant to the sophistication of the offerees. The Court is equally unimpressed by Wallace's contention that Kenton's minimum investment requirement provided any safeguard of investor sophistication.

■ Even if the Court were to find that Defendants had created an issue of material fact with respect to investor sophistication, "[s]ophistication is not a substitute for access to the information that registration would disclose." *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 902–03 (5th Cir.1977) (holding that an engineering degree, investment experience, and large net worth were insufficient to show a private offering exemption absent a "sufficient basis of accurate information upon which the sophisticated investor may exercise his skills.") With respect to the offerees' access to information, Defendants claim that "investors were given the names and telephone numbers of [Kenton] officials and sales agents of whom they could ask questions" and that "at least some investors" received copies of AP's financial statements. Def.'s Opp. at 29. Defendants have offered no evidence, however, that Kenton even possessed the kind of information that would normally be disclosed in a registration statement.[9] Ab-

---

9. There are thirty-two categories of information that must be included in a registration statement. Securities Act of 1933 Sched. A,

15 U.S.C. § 77aa. For example, the issuer must disclose the nature and general character of the issuer's business; its capital struc-

sent any evidence that Defendants provided sophisticated investors with meaningful access to information equivalent to that which would have been provided in a registration statement, the Court concludes that Defendants do not qualify for an exemption from section 5's registration requirements. *See id.*

### 2. Regulation D Exemption

In the alternative, Defendants claim that they are entitled to an exemption from section 5 under Regulation D, 17 C.F.R. §§ 230.501–506. Rules 504–506 establish three separate exemptions from registration for certain limited offerings.[10] Before an issuer may claim one of these exemptions, it must first comply with Rules 501–503, which set forth general terms and conditions applicable to all three exemptions. The SEC alleges that Defendants failed to demonstrate that it satisfied the information requirements of Rule 502, which instructs that issuers must provide all "non-accredited" investors with an audited balance sheet of the issuer. 17 C.F.R. § 230.502. There are eight categories of natural persons or entities that satisfy the definition of "accredited investor" set forth in Rule 501. 17 C.F.R. § 230.501(a). Defendants have offered no evidence tending to show that their investors were accredited or that they were furnished with the requisite information. The only argument that the Defendants make with respect to this requirement is that the SEC's investigation halted the program "prematurely," before compliance with Rule 502 had become necessary.[11] Defendants do not support this claim with any cites to the record whatsoever. Def.'s Opp. at 31. Absent some evidence to substantiate this claim, Defendants' attempt to qualify for a Regulation D exemption must fail. Compare *Wright v. National*

ture; the remuneration to be paid to the issuer's directors and to its officers and other employees; amounts, itemized in reasonable detail, of expenses incurred in connection with the sale of the security; and a detailed balance sheet of the assets and liabilities of the issuer certified by an independent public or certified accountant. *Id.*

*Warranty Co., LP*, 953 F.2d 256, 260 (6th Cir.1992) (holding that summary judgment for defendants was proper where defendant's claim for a Regulation D exemption was supported by affidavits).

### C. Fourth Claim: Violation of the Broker Registration Provisions of the Exchange Act

Section 15(a) of the Exchange Act makes it unlawful for brokers to offer securities without registering themselves with the SEC. *See* 15 U.S.C. § 78o(a)(1). A broker is "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Defendants do not dispute that they were effecting transactions in securities for the account of others. Instead, they argue that they were not "engaged in the business" because their activities were not sufficiently regular. In support of this position, Defendants allege that Wallace had not worked in the securities industry in the years immediately prior to forming Kenton, and that Kenton itself did "no other business and has since shut down." Def.'s Opp. at 31.

"Engaged in the business" is not defined by statute. Cases and SEC No–Action letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being "engaged in the business." *See, e.g., SEC v. Margolin*, 1992 WL 279735, *5 (S.D.N.Y.) (citing *Massachusetts Fin. Servs., Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass.1976)). Regularity of participation has been demonstrated by such factors as the dollar amount of securities sold, *see SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C.1980) ($4.3 million of secu-

**10.** Defendants do not specify under which Rule they claim an exemption. *See* Def.'s Opp. at 30.

**11.** Rule 502 indicates that the information should be furnished "a reasonable time prior to sale." 17 C.F.R. § 230.502(b)(1).

rities sold); *UFITEC, S.A. v. Carter,* 20 Cal.3d 238, 142 Cal.Rptr. 279, 571 P.2d 990 (1977) (several million dollars of securities sold); and the extent to which advertisement and investor solicitation were used, *see SEC v. Deyon,* 977 F.Supp. 510, 518 (D.Me.1997) (substantial solicitation); *National Executive Planners,* 503 F.Supp. at 1073 (investors solicited actively); Joseph McCulley, SEC No–Action Letter, [1972–73 Transfer Binder Fed. Sec. L. Rep. (CCH) ¶ 78,982, at 82,111 (Aug. 2, 1972) (advertising "on a single, isolated basis" is not enough, but more than that would require registration)]. A corporation could be a broker even though securities transactions are only a small part of its business activity. *See UFITEC,* 142 Cal.Rptr. 279, 571 P.2d at 994 (citing 2 Louis Loss, *Securities Regulation* 1295 (1961)).

■ As the SEC's supporting evidence indicates, Defendants' securities transactions were not a single, isolated transaction, but rather the first step in a larger enterprise. Kenton was established for the exclusive purpose of participating in trading programs. *See* Def.'s Opp. at 5. To that end, Defendants received pledges to invest from over forty individuals totaling $17,450,000, actually collecting $1,745,-000 from twelve investors. *See* Pl.'s Reply at 9. In its representations to investors, Kenton held itself out as being engaged in the business, actively soliciting participation. On these facts, the Court finds that no triable issue exists as to whether Defendants' participation was regular enough to require registration. *See National Executive Planners,* 503 F.Supp. at 1073. The SEC is entitled to summary judgment on this claim.

**D. Fifth Claim: Violation of the Investment Advisor Act**

The Fifth Claim alleges violations of section 203(a) of the Investment Advisors Act of 1940, 15 U.S.C. § 80b–3(a), which prohibits any investment adviser from using instrumentalities in interstate commerce unless registered with the SEC. An "investment adviser" is defined as "any person who, for compensation, engages in the business of advising others ... as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b–2(a)(11). In support of this claim, the SEC relies primarily on the language of the "Investment Advisor's Agreement," which was replaced by the substantially identical "Joint Venture Agreement" to avoid U.S. registration requirements. *See* Pl.'s Mot. Summ. J. Exs. 12 and 13. In further support of this claim, the SEC alleges that Defendants gave investors advice about how to invest; that securities were to be chosen at their discretion; and that they received compensation for this service separate from the compensation they received for their broker services. *See* Pl.'s Mot. Summ. J. at 23–24.

Defendants argue that the title of the "Investment Advisor's Agreement" should not be dispositive, and urge the Court to look instead at Defendants' functions with respect to the investors. Viewed from this perspective, Defendants argue that Kenton "was set up to manage a joint venture in which a group of individuals had invested, akin to the general partners of a limited partnership." Def.'s Opp. at 32. Defendants challenge the SEC's characterization of the material they sent to investors as dispensing investment advice, and assert that discretion in where to invest is not enough to make them investment advisers as a matter of law. *Id.* Finally, Defendants argue that they cannot be both brokers and investment advisers, since the definition of investment adviser specifically excludes brokers whose investment advice is incidental to their business as brokers and who receive no special compensation for their investment advice. *See* 15 U.S.C. § 80b–2(a)(11)(C); Def.'s Opp. at 34 n. 10.

Because the Court has found that Defendants were indeed brokers within the meaning of the Exchange Act, *see supra,* the SEC must show (1) that Defendants' investment advice was more than incidental to their broker activities and (2) that Defendants received special compensation for such advice. The definition of investment adviser specifically excludes "any

broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefore." 15 U.S.C. § 80b–2(a)(11)(C).

■ The SEC has demonstrated that Defendants' investment advice was more than incidental to their broker services. Defendants attempted to change the Investment Advisor's Agreement for the sole purpose of avoiding U.S. registration requirements, not because that agreement misrepresented the substance of the relationship between Kenton and its investors. Kenton's cover letter to investors explaining the significance of the new agreement baldly states that the title has been changed to avoid registration, without any indication that the arrangement has been changed in any way. Despite a few cosmetic changes, the substance of the resulting Joint Venture Agreement remains the same. Instead of providing "specialist investment advice," the Joint Venture Agreement offers "specialist investment information." According to both the agreements, the "[Investment Advisor or Joint Venture] shall arrange investments on behalf of the Investor in such of the Programmes as the [Investment Advisor or Joint Venture] shall determine at its sole discretion." Pl.'s Mot. Summ. J. Exs. 12 and 13. Courts have found that such discretion and control over the underlying investment constitute investment advice. *See United States v. Elliott,* 62 F.3d 1304, 1310 (11th Cir.1995) (finding that defendants had clearly provided investment advice to their customers by advising investors in their choices and controlling their investments); *Abrahamson v. Fleschner,* 568 F.2d 862, 871 (2d Cir.1977) ("[M]any investment advisers 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds."). Given the investors' utter reliance on Kenton to select investments, the Court finds that this package of "specialist investment advice/information" and investment management were more than incidental to Kenton's broker activities.

■ The SEC has also shown that the Defendants received "special" compensation for their services, including the provision of investment advice. The Joint Venture Agreement entitles Kenton to deduct fees of 10% of the investment amount to cover finder's fees; 15% of the investment amount to cover administrative costs; an unspecified amount of "other costs" incurred by Kenton in "arranging the leverage required"; and, in addition to these considerable fees, 50% of any profits earned on the investment. See Pl.'s Mot. Summ. J. Ex. 13 ¶ 4. The term "special" means "compensation other than that received by a broker-dealer in the ordinary course of business, *i.e.,* commissions." American Capital Fin. Servs., Inc., SEC No–Action Letter, [1984–85 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 77,916 at 79,457 (April, 29, 1985). By the terms of the agreement, the fees and costs assessed by Kenton cover any legitimate broker expenses that Kenton might have incurred. Kenton's enormous share in any profits, however, is a separate form of compensation. Although it is not designated for any specific purpose, it is also not a commission received by a broker in the ordinary course of business. The Defendants claim that they were "paid the same fee for all services," see Def.'s Opp. at 34 n .10, but this conclusory statement is unsupported by any citations to the record and is flatly contradicted by the language of the Joint Venture Agreement, which explicitly links all charges but the 50% of profits to a specified activity. It is reasonable to infer that this sizeable additional charge is special compensation for Kenton's additional services of investment advice and management. Because the SEC has shown that the defendants received special compensation for the provision of non-incidental investment advice, the SEC's Motion for Summary Judgment on the Fifth Claim is granted.

### E. Remedies

Having granted summary judgment for the SEC on all claims, the Court will now

consider the matter of remedies. In its Motion for Summary Judgment, the SEC requested that the Court grant the following relief: (1) a permanent injunction against Kenton and Wallace; (2) full disgorgement; (3) prejudgment interest on the disgorgement amount; and (4) civil monetary penalties.

## 1. Permanent Injunction

 Upon a finding of liability under the federal securities laws, permanent injunctive relief is warranted where "the defendant's past conduct indicates ... that there is a reasonable likelihood of further violation(s) in the future." *SEC v. Savoy Industries, Inc.,* 587 F.2d 1149, 1168 (D.C.Cir.1978) (citing *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 99–100 (2d Cir.1978) (emphasizing "the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence.")); *see also SEC v. Bilzerian,* 29 F.3d 689, 695 (D.C.Cir.1994). Factors to be considered include whether defendant's conduct was isolated or part of a pattern; whether the violation was flagrant and deliberate or merely technical; and whether the defendant's business will present opportunities for future violations. *See Bilzerian,* 29 F.3d at 695. The SEC does not have to demonstrate irreparable harm or the inadequacy of other remedies. *See SEC v. Stratton Oakmont, Inc.,* 878 F.Supp. 250, 255 (D.D.C.1995) (citing *SEC v. Unifund SAL,* 910 F.2d 1028, 1036 (2d Cir.1990)).

 The evidence demonstrates that Defendants' violations of the securities laws were reckless at best, and more likely intentional. Their fraudulent representations to investors were hardly "technical violations." Furthermore, the SEC has produced undisputed evidence that Wallace sought opportunities for participation

in similar programs on three occasions prior to forming Kenton. *See* Pl.'s Statement of Genuine Issues ¶ 20; Def.'s Statement of Genuine Issues at 30–31. This evidence of past conduct suggests a pattern of behavior such that there would appear to be a reasonable likelihood of future violations. These facts all weigh in favor of granting an injunction, and Defendants do not raise any arguments challenging the legal basis for an injunction.[12] Accordingly, the Court will enter a permanent injunction against Kenton and against Wallace.

## 2. Disgorgement

 "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Financial Corp., Ltd.,* 890 F.2d 1215, 1230 (D.C.Cir.1989). When calculating the disgorgement amount, the court should make a reasonable approximation of the profits causally connected to the violation. *See id.* at 1231. The SEC has asked the Court to order Kenton and Wallace to disgorge $264,245.10, which represents the difference between the funds actually collected by Kenton and the principal that has either been re-paid to investors or collected into the registry of the Court. *See* Pl.'s Mot. Summ. J. at 26. Defendants do not dispute this figure. As the SEC has established that this figure is a reasonable approximation of unlawful profits, the burden of proof shifts to Defendants to clearly demonstrate that this figure is not a reasonable approximation. *See First City,* 890 F.2d at 1232.

 In response, Defendants argue that disgorgement is improper because these funds are no longer in Kenton's possession, having been paid to third parties for "legitimate business expenses." *See* Def.'s Opp. at 35, Def.'s Opp. Ex. O (chart accounting for the shortfall).[13] In support

---

12. The Court also notes that Wallace has not acknowledged that he violated the law. Furthermore, when Wallace was asked at his deposition whether he had participated in any trading programs since issuance of the TRO, he refused to answer.

13. The parties do not dispute that the only funds Wallace received personally were for expenses.

of this proposition, Defendants rely primarily on *SEC v. Thomas James Associates, Inc.*, in which the court held that a court ordering disgorgement "may consider as an offset the expenses incurred by defendant in garnering such unjust enrichment." 738 F.Supp. 88, 95 (W.D.N.Y. 1990). The Court agrees with the SEC that this case does not reflect the "overwhelming weight of authority hold[ing] that securities law violators may not offset their disgorgement liability with business expenses." *SEC v. Hughes Capital Corp.*, 917 F.Supp. 1080, 1086 (D.N.J.1996) (distinguishing *Thomas James* as limited to disgorgement of "excessive profits"); *see also SEC v. Great Lakes Equities Co., et al.*, 775 F.Supp. 211, 214–15 (E.D.Mich. 1991) (rejecting deductions from the disgorgement amount for overhead, commissions, and other expenses; criticizing *Thomas James* for equating disgorgement with restitution); *SEC v. Benson, et al.*, 657 F.Supp. 1122, 1134 (S.D.N.Y.1987) (stating that the "manner in which [defendant] chose to spend his misappropriations is irrelevant as to his objection to disgorge"). Defendants attempt unsuccessfully to distinguish these cases. The SEC has provided ample evidence that all the funds collected by Kenton were obtained fraudulently, and Defendants may not escape disgorgement by asserting that expenses associated with this fraud were legitimate.[14] Disgorgement, therefore, is a proper remedy.

**3. Prejudgment Interest**

 The district court has broad discretion in deciding whether to grant prejudgment interest on the disgorgement amount and, if such interest is granted, what rate should be used to calculate the amount. *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1476 (2d Cir.

1996). The court's decision should be informed by the following factors: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* (quoting *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833–34 (2d Cir.1992)).

 Defendants argue that they should not be required to pay prejudgment interest on the disgorgement amount because they have not had continuous use of the funds prior to judgment, and therefore did not benefit from them. *See SEC v. Stephenson*, 732 F.Supp. 438 (S.D.N.Y. 1990) (whether defendant has had the benefit of access to the funds prior to judgment is a "consideration of fairness"). The Court does not find this argument persuasive. While it is true that the Defendants did not retain possession of the funds they collected, having returned most to investors and having used the remainder to pay finder's fees, Wallace's expense, and other Kenton expenses, see Def.'s Opp. Ex. O, this does not mean that they did not benefit from those funds. The funds were paid out to various Kenton agents for the purpose of furthering Kenton's fraudulent scheme. Viewed in light of the totality of the circumstances, including the statute's remedial purposes and the need to fully compensate investors who have been deprived of the use of these funds for a considerable period of time, the Court finds that an award of prejudgment interest on the disgorgement amount is proper.

The SEC has requested, and the Defendants do not oppose, that the Court calculate the amount of interest owed using the rate set quarterly by the Internal Revenue

14. Defendants also argue that Wallace should not be required to disgorge funds received by Kenton because Kenton has a valid and separate existence from Wallace. The undisputed facts, however, clearly establish that Wallace was a control person, and therefore liable for disgorgement of whatever funds Kenton received because he cannot show that he "did not induce [Kenton's] violations and that he maintained and enforced a reasonable and proper system of supervision and internal control." *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472–73 (2d Cir.1996); 15 U.S.C. § 78t(a).

Service for money owed to the United States Treasury. *See, e.g., First Jersey,* 101 F.3d at 1476 (approving the use of the IRS underpayment rate in connection with disgorgement).

### 4. Civil Penalty

As a final remedy, the SEC requests that a civil penalty be imposed only against Wallace pursuant to section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3). Congress added this section in 1990 "to achieve the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Moran,* 944 F.Supp. 286, 296 (S.D.N.Y.1996). The legislative history indicates that such a penalty is necessary because

> [d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud ... authority to seek or impose substantial monetary penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.

*Id.* (quoting H.R.Rep. No. 101–616 (1990)). The statute provides that any civil penalty is to be determined by the Court "in light of the facts and circumstances" of the particular case. 15 U.S.C. § 78u(d)(3).

Section 21(d)(3) establishes three tiers of penalties. At a minimum, imposition of a first tier penalty is appropriate for each violation. If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," second tier penalties should be imposed. If second tier aggravating factors are present and the violation also "resulted in substantial losses or created a significant risk of substantial losses to other persons," the court may impose third tier penalties. *Id.*

15. This amount was reached by multiplying the maximum third tier penalty for natural persons ($100,000) by the number of investors who actually sent money to Kenton (12).

In light of the facts and circumstances, the Court finds that imposition of third tier penalties is appropriate. The Court has already found that Wallace failed to conduct meaningful due diligence into the trading program that he was promoting, and that Wallace engaged in other fraudulent and reckless misstatements in connection with that program. The undisputed facts show that but for the intervention of the SEC, the substantial sums pledged by investors would have been invested in a trading program that Wallace had not genuinely investigated. AP, the bond company that was supposed to insure investors against such losses, was not actually licensed to issue surety bonds, nor were its accounting statements completed in accordance with accepted accounting standards, nor were its assets as substantial as Kenton represented to investors, nor did they have sufficient assets to make good on their guarantee. Rather than investigating AP, Defendants attempted to shift that responsibility to the investors. These facts clearly demonstrate the existence of a "significant risk of substantial losses," satisfying the second requirement for imposition of third tier penalties. Accordingly, the Court shall impose a civil penalty of $1.2 million on Wallace, the lesser of the amounts proposed by the SEC.[15]

## III. CONCLUSION

For the foregoing reasons, Plaintiff SEC's Motion for Summary Judgment is granted in full. An order accompanies this Memorandum Opinion.

## ORDER

Upon consideration of all the papers filed and the full record herein, and for the reasons stated in the Court's accompanying Memorandum Opinion, it is, this 30 of September, 1998, hereby.

Defendants' objections focused entirely on which tier the Court should apply, but did not address the multiplier, therefore the Court will adopt the SEC's proposed method.

**ORDERED** that the Plaintiff's Motion for Summary Judgment [# 97] against Defendants Kenton Capital, Ltd., and Donald C. Wallace is **GRANTED**; and

## I.

IT IS HEREBY ORDERED that Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Sections 5(a) and 5(c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) and (c) ] by, directly or indirectly, in the absence of any applicable exemption:

a. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the securities of any issuer, through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect as to such securities;

b. carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale, the securities of any issuer, unless and until a registration statement is in effect as to such securities; or

c. making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the securities of any issuer, unless and until a registration statement has been filed with the Commission as to such securities, or while a registration statement as to such securities is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding of examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

## II.

IT IS FURTHER ORDERED that Defendants Kenton Capital Ltd. and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a) ], directly or indirectly, by, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly,

a. employing any device, scheme, or artifice to defraud;

b. obtaining money or property by means of any untrue statement of a material fact or omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

## III.

IT IS FURTHER ORDERED that Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b) ], and Rule 10b–5 [17 C.F.R. § 240.10b–5] promulgated thereunder, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

a. employing any device, scheme, or artifice to defraud;

b. making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

## IV.

IT IS FURTHER ORDERED that Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] by, in the absence of any applicable exemption, making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless registered as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

## V.

IT IS FURTHER ORDERED that Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Section 203(a) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-3(a)] by, in the absence of any applicable

exemption, making use of the mails or any means or instrumentality of interstate commerce in connection with any business as an investment adviser unless registered as an investment adviser in accordance with Section 203(c) of the Advisers Act [15 U.S.C. § 89b-3(c)].

## VI.

IT IS FURTHER ORDERED that:

a. Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, and successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, shall within seven (7) days of receipt 8 this judgment transfer to the registry of this Court any funds raised in connection with the offering of investment interests in programs of Kenton Capital, Ltd., that are held by them, under their control or over which they exercise actual or apparent investment or other authority, in whatever form such funds may presently exist and wherever located, as of the date of this Judgment;

b. Defendants Kenton Capital, Ltd., and Donald C. Wallace, their officers, agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, shall within seven (7) days of receipt 8 this judgment authorize transfer or transfer to the registry of this Court any funds of the Defendants, under their control or over which they exercise actual or apparent investment or other authority (including funds in corporations or partnerships they control), in whatever form such funds may presently exist which were ordered to be frozen by any previous order in this case;

c. Should funds covered by subparagraph (b) above not be timely deposited

in the registry of this Court, any financial or brokerage institution or other person or entity that, as of the date of this Judgment, is holding any funds which were ordered to be frozen by any previous order in this case in the name, for the benefit, or under the control of Defendants Kenton Capital, Ltd., or Donald C. Wallace shall within fourteen (14) days of this judgment transfer to the registry of this Court any such funds.

## VII.

IT IS FURTHER ORDERED that Defendants Kenton Capital, Ltd., and Donald C. Wallace are jointly and severally liable with all other Defendants to disgorge $1,745,000.00. Since all but $264,245.10 of the disgorgement amount has been paid to investors pursuant to previous court orders, the Defendants are ordered to pay only the remaining $264,245.10. These Defendants are also liable for prejudgment interest on this remaining disgorgement amount at the rate of interest used by the Internal Revenue Service for the underpayment of taxes as set forth at 26 U.S.C. § 6621(a)(2), which is a reasonable approximation of the additional unjust enrichment defendants could have earned on the moneys to be disgorged. Accordingly, the SEC is requested to file a statement of the amount of prejudgment interest due as of the date of this order and an additional order for prejudgment interest will then be entered against Defendants Kenton Capital, Ltd., and Donald C. Wallace.

## VIII.

IT IS FURTHER ORDERED that Defendant Donald C. Wallace pay a civil monetary penalty in the amount of $ 1,200,000.00.

## IX.

IT IS FURTHER ORDERED that payments shall be made:

a. in full within ten days of the date of this order;

b. of disgorgement and interest into this Court's registry by certified check or money order drawn to the order of "Clerk, United States District Court, District of Columbia," noting on the face of the check the caption and civil action number of this case, whereupon the Clerk of this Court, or the Financial Deputy Clerk, shall deposit such funds into an interest-bearing account (the "Account") with the Court Registry Investment System ("CRIS");

c. of civil penalty to the SEC, which shall be transmitted to the Comptroller, SEC, 450 5th Street, NW, Washington, DC 20549, noting on the face of the check the caption and civil action number of this case and the name of the Defendant making the payment;

d. simultaneously with payments, Defendants shall send copies of any certified checks or money orders to Paul Berger, Assistant Director, Division of Enforcement, Securities and Exchange Commission, 450 Fifth Street, N.W., Stop 4–7, Washington, D.C. 20549, under cover letter identifying the Defendants, the case number of the action, the name of the Court, and the Commission's file number (HO–3028);

e. the Account shall be held by the CRIS until further order of the Court, and distributed pursuant to a Court-approved plan to be submitted by the Commission, but in no event shall the money disgorged revert, directly or indirectly, to Defendants, or to the heirs and assigns of the Defendants;

f. interest earned on the Account shall be credited to the Account and shall thereafter be treated in the same manner as principal; and

g. the Clerk of the Court is directed without further order to deduct from the income earned on the investment a fee, not exceeding that authorized by the Judicial Conference of the United States and set by the Director of the Administrative Office at or equal to 10% of the income earned in the investment so held.

**IT IS FURTHER ORDERED** that now that there has been a disposition with re-

spect to all Defendants, this case is DIS-MISSED WITHOUT PREJUDICE for a period of ninety (90) days, at the end of which it shall be dismissed with prejudice unless any of the parties files a motion with the Court showing why such a dismissal would be inappropriate.

## ORDER

Upon consideration of the stipulation for dismissal of appeal, it is

**ORDERED** that the Clerk note on the docket that this case is dismissed. No mandate will be issued.