LaFauci v. NHDOC                    CV-99-597-PB  02/23/05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Anthony LaFauci

    v.                              Civil No. 99-597-PB
                                   2005 DNH 029
New Hampshire Department of
Corrections et al.


MEMORANDUM AND ORDER


Plaintiff Anthony LaFauci, proceeding pro se, has sued 47 officials working for, or at the behest of, the New Hampshire State Prison ("NHSP"). He charges that defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. See 42 U.S.C. § 1983. In his multi-count complaint, LaFauci, who is currently incarcerated at the Osborn Correctional Institution in Somers, Connecticut, seeks injunctive relief ordering Warden Michael Cunningham[1] to provide copies of all of LaFauci's records at the state's expense,

---

[1] The current Warden of the New Hampshire State Prison is Bruce Cattell.

expunge "trumped up" disciplinary convictions from his prison record, and release him from prison. LaFauci also seeks monetary damages.

Defendants have moved for summary judgment on each of LaFauci's claims. They make the preliminary argument that LaFauci's claims should be dismissed based on his alleged failure to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act ("PLRA"). See 42 U.S.C. § 1997e(a). Defendants contend that LaFauci failed to exhaust all available administrative remedies by pursuing his claims through the proper chain of command, as detailed in NHSP's "Administrative Grievance Scheme." See LaFauci v. New Hampshire Dep't of Corrections, No. 99-253-M, 2001 WL 1570932, at *3 (D.N.H. Oct. 31, 2001) (unpublished order)(outlining the three-tiered "administrative scheme through which inmates may seek to have various complaints addressed and resolved"). Alternatively, defendants argue that there are no genuine issues of material fact as to any claim and, therefore, that they are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). For reasons set forth more fully below, I grant defendants' motion for summary judgment in part, and deny it in part.

# I.  PROCEDURAL HISTORY

The procedural history of this case is long and convoluted. It has been unduly, and indeed unnecessarily, complicated both by LaFauci's efforts to inundate the court with a deluge of pleadings and by the defendants' inability to promptly and effectively respond to these pleadings.  Furthermore, an ongoing series of discovery disputes have needlessly prolonged the litigation.

LaFauci filed his original complaint on December 21, 1999, and the case was referred to Magistrate Judge Muirhead for initial review.  See 28 U.S.C. § 1915A(a); U.S. District Court District of New Hampshire Local Rule 4.3(d)(2).  On May 16, 2000, Magistrate Judge Muirhead issued his explanatory Order, (Doc. No. 5), and Report and Recommendation, (Doc. No. 6), and ordered the complaint served on the defendants.  I approved this Report and Recommendation on June 7, 2000.  (Doc. No. 8).  After first moving for an enlargement of time, defendants answered the original complaint on July 17, 2000. (Doc. No. 20).  Then, on August 15, 2000, LaFauci moved for the first of three preliminary injunctions and temporary restraining orders ("TRO") (the second

motion for a preliminary injunction and TRO was filed on September 1, 2000). Six days later, on August 21, 2000, he moved for leave to file an amended complaint. The court granted his motion on September 7, 2000.

Throughout the fall of 2000 and into 2001, LaFauci and the defendants engaged in the first of several discovery disputes, punctuated by several motions to compel production of documents, and LaFauci's motion to have defendants return his legal work. On November 20, 2000, the Magistrate recommended denial of LaFauci's first and second motions for a preliminary injunction and TRO. I approved the Magistrate's recommendation on January 29, 2001. In response, LaFauci appealed the decision to the First Circuit on March 28, 2001.[2]

Several months later, on July 16, 2001, LaFauci filed a motion for contempt, charging that defendants failed to comply with a court order. The Magistrate denied this motion on August 17, 2001. Another round of discovery disputes, including more motions to compel, extended the case through 2001 and into 2002.

---

[2] The First Circuit affirmed this court's judgment on June 10, 2002.

-4-

On October 9, 2002, defendants filed an answer to LaFauci's amended complaint. (Doc. No. 89). LaFauci then filed yet another amended complaint on April 3, 2003. (Doc. No. 98). The defendants moved to dismiss the amended complaint on September 2, 2003, (Doc. No. 101), and then, on November 10, 2003, moved to stay discovery pending a ruling on the motion to dismiss. Ten days later, on November 20, 2003, I issued an order granting in part and denying in part defendants' motion to dismiss. Specifically, I concluded that only Incidents 4, 5, 7, 8, 9, 10, and 11 remained viable.[3] I also ordered defendants to file a motion for summary judgment on or before January 15, 2004.

Like the previous three years, 2003 and the first six months of 2004 were characterized by yet another round of discovery disputes, including another series of motions to compel. In addition, LaFauci filed his third motion for a preliminary injunction on December 29, 2003. On January 23, 2004, the Magistrate recommended that this motion be denied. After twice

---

[3] In his May 16, 2000 Report and Recommendation (Doc. No. 6), Magistrate Judge Muirhead referred to the counts in LaFauci's complaint, as LaFauci had, as "Incidents." In the interest of consistency, I will continue to identify the claims as Incidents, rather than as Counts.

moving to enlarge the time to file, defendants moved for summary judgment on March 10, 2004. (Doc. No. 123). Then, in April 2004, LaFauci moved to enlarge the time to object to defendants' motion for summary judgment.

On July 27, 2004, I held what was originally scheduled as the final pretrial conference. At that hearing, I removed the case from the trial list pending a ruling on the defendants' motion for summary judgment, and clarified that Incident 3 had not been dismissed in full, and thus remained a viable claim. I also ordered LaFauci to file his objection to defendants' motion for summary judgment no later than September 27, 2004, and ordered defendants to file their reply no later than October 27, 2004. On October 18, 2004, LaFauci filed his objection to defendants' motion for summary judgment. (Doc. Nos. 263 & 264). Finally, on December 5, 2004, defendants' filed their reply to LaFauci's objection. (Doc. No. 270). This Memorandum and Order addresses the issues raised in these motions.[4]

_____

[4] Three other motions are also ripe for review. LaFauci's Motion Requesting for Copies of Any Kinds of Documentation of Any Internal Investigations That Involved Named Defendants in This Complaint With Other Inmates (Doc. No. 265) is denied. The remaining motions, defendants' Motion for Clarification and Enlargement of Time (Doc. No. 267) and Motion for Enlargement of

-6-

## II.  **BACKGROUND**[5]

The events giving rise to the Incidents in LaFauci's complaint occurred on several occasions between May 16, 1997 and January 16, 1998.  At the heart of LaFauci's complaint is his allegation that while he was incarcerated at the New Hampshire State Prison in Concord, prison officials engaged in a concerted effort to harass, abuse, and on several occasions, assault him. LaFauci complains that defendants' actions denied him access to the courts, in violation of the First and Fourteenth Amendments, based on the alleged retaliatory actions described in Incidents 3, 4, 5, and 7 through 11.  He also charges that the conduct of prison officials and other inmates described in Incidents 4, 5, and 10 violates the Eighth Amendment's prohibition against cruel and unusual punishment.

### A.    **Incident 3: Retaliation Claim**

In Incident 3, LaFauci alleges that on May 16, 1997,

_____

Time from November 17, 2004 to December 3, 2004 (Doc. No. 269) are moot.

[5]  The facts are described in the light most favorable to LaFauci, the non-movant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 93-4 (1st. Cir. 2001)(explaining the operation of Fed. R. Civ. P. 56)(citation omitted).

Corrections Officer ("C.O.") John Eichhorn denied him access to the law library and issued him a disciplinary report for violation of Rule 14B (insubordination to a staff member) and Rule 56B (lying or providing false or misleading information to a staff member). LaFauci charges that the disciplinary reports were unwarranted and, in support of this charge, points out that he was later found not guilty of these violations. LaFauci also complains that on June 22, 1997, Eichhorn verbally harassed him, and, later the same day, told him that he would receive a disciplinary ticket for violating Rule 31B (failing to stand for count, interfering with the taking of count, or being out of place for count). According to LaFauci, these actions were taken to "punish" him for filing a lawsuit, LaFauci v. Brodeur, 97-47-JD, against several prison officials.

B.   **Incident 4: Retaliation and Eighth Amendment Claim**

LaFauci alleges in Incident 4 that he was assaulted in violation of the Eighth Amendment's prohibition on cruel and unusual punishment, and that defendants retaliated against him for filing suit against them. He charges that on June 27, 1997, defendants moved him from the South Unit to the H-Building, where he was attacked and beaten by four other inmates. In particular,

he states that when he placed his belongings in his new room, a black inmate approached him and said, "This is a black man's room." After LaFauci explained that he was newly assigned to the room, four black inmates jumped him and physically assaulted him, resulting in a fractured right hand. His injuries were photographed by Corporal William Wilson, and he was sent to Concord Hospital for treatment. On June 30, 1997, LaFauci was examined by an orthopedic surgeon, Dr. James Forbes, M.D., who fitted him with a cast. LaFauci suggests that Lieutenant Daniel Torres knew that he would be assaulted upon his arrival at the new room in the H-Building.

LaFauci next claims that on July 3, 1997, C.O. Ken Gorski and C.O. Lee Morrison called him names and threatened to hang him with bedsheets, and that Morrison threw some of LaFauci's legal work in the toilet. According to LaFauci, the following day, July 4, 1997, C.O. Arthur Locke called him a "nigger lover" and made comments "of a sexual nature" about him. He also complains that on July 7, 1997, Eichhorn taunted him while he was in the shower, shouting ""HA! HA! HA! HA! I got you moved out of the South Unit!," and banging on the shower window. Four days later, Eichhorn came to LaFauci's Special Housing Unit ("SHU") and

yelled that he was going to "harass and abuse" him.  One week later, on July 14, 1997, C.O. Charles Boyajian and C.O. Neil Smith asked LaFauci if he wanted to go to the law library, but then denied him access to his legal work.  LaFauci later received a disciplinary ticket for violating Rule 43B (conduct which disrupts or interferes with the security or orderly operation of the institution), but was not permitted to call witnesses to the July 23, 1997 disciplinary hearing on this matter.  Two days later, on July 16, 1997, Locke "mentally assaulted" LaFauci, denied him a shower, and would not let him leave his cell.  These actions, LaFauci claims, were retaliation against him for filing LaFauci v. Brodeur.

## C.    Incident 5: Retaliation and Eighth Amendment Claims

In Incident 5, LaFauci alleges both retaliation and an Eighth Amendment violation.  Here, LaFauci maintains that on July 28, 1997, C.O. Shawn O'Neil and C.O. Smith asked LaFauci if he was going to the law library.  When LaFauci said yes, O'Neil took LaFauci's legal work from him because he [O'Neil] wanted to review it.  When LaFauci entered the law library, O'Neil and Smith slammed the door behind him, locked the door, and took his legal work before going back down the stairs.  A short time later

-10-

C.O. Lee Morrison came to the window of the library, and while LaFauci watched, took some of his legal documents, tore them up, and laughed while doing so. LaFauci called for Unit Manager Walter Davies to explain Morrison's conduct, but C.O. Christopher Walters arrived first and told LaFauci to shut up. Soon thereafter, Davies arrived and as LaFauci was explaining his mistreatment, six correctional officers, including C.O. Eric Denis, O'Neil, Smith, Lee Morrison, and C.O. Shelton Fitton, joined Davies at the library.[6] They slammed the door, turned off the surveillance camera, and verbally harassed him. When LaFauci protested, O'Neil told him to turn around and kneel on the floor, and as he did so, O'Neil hit him across the back of his head, neck, and shoulders. The other officers then jumped on his back, knocking him into a small table and then to the floor, causing his nose and mouth to bleed. LaFauci was then hog tied and taken back to his cell and left, face down, for about 25 minutes. While he was still hog tied in his cell, Smith jumped on his back, choked him, and forced his fingers into LaFauci's ears.

---

[6] C.O. Fitton was not named as a defendant in the original complaint. LaFauci seeks to add him as a defendant in the amended complaint (Doc. No. 98). See Am. Compl. ¶ 101.

Smith then left LaFauci on the floor of his cell, handcuffed and bleeding from the nose and mouth.  A short time later Nurse Brad Bowen entered LaFauci's cell and removed the handcuffs, but failed to provide any medical treatment for the bruises, scratches, red blotches, and dizziness that resulted from the assault.

Then, very early in the morning of July 31, 1997, C.O. Brett Morrison kicked the glass window on the day room and shouted, which woke him up and "inflicted unreasonable noise physically abusing and mentally harassing" him.

## D.    Incident 7: Retaliation Claim

In Incident 7, LaFauci charges that on September 12, 1997, C.O. Jay Hislop issued him disciplinary tickets for violating rules 14B (insubordination to a staff member) and 40B (failing to perform work or other assignment as ordered by a staff member). The incident occurred in the kitchen where Hislop ordered LaFauci to shuck ten bags of corn.  LaFauci completed one bag, and was starting the second, when Hislop told him that he could not sit down while shucking corn.  At this point, C.O. Thomas Casey made a sarcastic comment and jokingly told Hislop that they should take LaFauci out back and "kick his ass."  Hislop then ordered

-12-

LaFauci to lift a 150-pound pan and LaFauci refused, explaining that back and neck problems prevented him from doing so.  Hislop then said he was going to make sure LaFauci got 50 extra hours of work and verbally abused him by calling him names. LaFauci approached Major Joseph Guimond and tried to explain that Hislop was harassing him.  Guimond ordered LaFauci to leave the kitchen and return to his unit immediately.  LaFauci claims that the disciplinary tickets resulting from this incident were issued in retaliation for his refusal to lift the pan and complete the corn shucking task.  He also complains that at the disciplinary hearing for this matter, held on September 23, 1997, he was not permitted to call Major Guimond as a witness, another act of retaliation.

E.    **Incident 8:  Retaliation Claim**

On November 18, 1997, when LaFauci was walking into the dining hall, C.O. Anthony Dragon shouted at him to pin his identification badge to his coat, where it would be visible, rather than to his shirt.  LaFauci first claims that his identification badge was pinned to his shirt rather than his coat because earlier in the day he was walking outside without a coat and, second, claims that the badge was in fact visible to Dragon.

-13-

In response to Dragon's order, LaFauci stated, "it's right here, open your eyes," or words to that effect, and then walked away muttering, "I'm not in the army." Dragon then issued him disciplinary tickets for violating rules 14B (insubordination to a staff member) and 39B (failing to obey . . . [an] order of a staff member). LaFauci claims Dragon's actions were retaliatory.

LaFauci also claims that at the December 1, 1997 hearing on this matter, the Hearing Officer, Lester Eldridge, "changed the face value of the ticket" and refused to record or videotape the disciplinary hearing. He further claims that Unit Manager John Martin improperly placed a letter describing this incident in LaFauci's offender folder without providing him with a copy of the letter. LaFauci maintains that Martin and Eldridge intended their actions to punish him for filing the lawsuit LaFauci v. Brodeur.

F.    **Incident 9: Retaliation Claim**

On December 3, 1997, C.O. Charles Boyajian verbally harassed LaFauci and put him in the J-tier day room on a precautionary watch, where he was deprived of water, clothing, and use of the bathroom. The day room smelled of urine, the floors were bloodstained, and the window frames had human feces in their

cracks.  LaFauci contends that Boyajian was retaliating against him for filing the lawsuit, <u>LaFauci v. Brodeur</u>.

Likewise, on either December 6 or December 8, 1997, C.O. Ken Gorski and C.O. A.J. Williams entered LaFauci's cell and took his legal work, approximately 100 pages of "white copies" of inmate request slips, telling him they were the state's property.[7] Gorski and Williams also called him degrading names, including "skinner," behind his back to other inmates.

Then on December 10, 1997, LaFauci received a disciplinary ticket for violating Rule 56B (lying or providing false or misleading information to a staff member).  Walter Davies "interviewed" this ticket and refused to allow LaFauci to call another inmate as a witness at the hearing held on December 17, 1997, and also refused to videotape or record the proceedings. These actions, LaFauci alleges, were also retaliatory.

## G.    Incident 10: Retaliation and Eighth Amendment Claims

The events of Incident 10, in which LaFauci claims abuse and harassment in violation of the Eighth Amendment, as well as retaliation, commenced on December 16, 1997.  On that date

---

[7] The white copies of inmate request slips and grievance forms are the copies retained by the inmate.

LaFauci was moved out of D-Pod and into C-Pod.  Immediately after the move, C.O. Jay Hislop, C.O. Joel Robinson, and C.O. Arthur Locke forced him to walk across the prison yard on the way to see Dr. Forbes, whose office is located outside the prison facility. LaFauci claims this walking caused pain and swelling in his knee. The following day, after LaFauci asked to be removed from his pod because he feared being brutally assaulted, C.O. Thomas Casey escorted him out of his cell, but forced him climb stairs and walk without crutches, resulting in additional pain and swelling in his knee.

On December 21, 1997, when LaFauci returned to his cell from the shower, he discovered that inmate Thomas McQueen had put water in the plastic bag containing LaFauci's legal work.  Prison officials, particularly C.O. Michael Poulicakos to whom LaFauci reported the incident, took no action.  Later that day, after LaFauci dried off his papers, inmate McQueen threw a bucket of water into LaFauci's cell, soaking his bedding and his legal work.  In response, LaFauci said it was a good thing he [LaFauci] was behind bars, because he would have "beat the shit out of . . . Thomas McQueen and someone should."  LaFauci was later informed that McQueen had been removed from the tier and received

a disciplinary ticket for his actions.

## H. Incident 11: Retaliation Claim

Finally, in Incident 11, LaFauci again alleges that several prison officials abused, harassed, and assaulted him in retaliation for filing LaFauci v. Brodeur.  He claims that on December 22, 1997, C.O. Mark Pistone and Corporal Kevin Keegan pushed the steel door of his cell into him, resulting in bruises to his body.  A short time later, C.O.s Brett Morrison, Lee Morrison, Pistone, and Cpl. Keegan removed LaFauci from his cell and forced him to walk without his crutches, down three flights of stairs, and across the yard to the Special Housing Unit.  The next day, when LaFauci asked that the telephones be turned on in the day room, Brett Morrison harassed him and later issued him a disciplinary ticket because LaFauci said that someone should beat up inmate McQueen.[8]  LaFauci claims that in actuality, Morrison took this action because LaFauci named him as a defendant in LaFauci v. Brodeur.  At the December 30, 1997 disciplinary hearing on this matter, Keegan admitted pushing LaFauci but the Hearing Officer, Raymond Guimond "covered up" Keegan's statement

_____

[8]  The factual allegations in Incident 10 appear to overlap the allegations in Incident 11.

and imposed on LaFauci an improper punishment.  Defendants also refused to videotape or record this proceeding.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  See id. at 248.

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of

-18-

material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate burden of proof, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996)(citing <u>Celotex</u>, 477 U.S. at 323; <u>Anderson</u>, 477 U.S. at 249). Neither conclusory allegations, improbable inferences, or unsupported speculation are sufficient to defeat summary judgment. <u>See</u> <u>Carroll v. Xerox Corp.</u>, 294 F.3d 231, 236-37 (1st Cir. 2002).

## IV. <u>ANALYSIS</u>

Following my ruling on the defendants' motion to dismiss (Doc. No. 101) and the pretrial hearing held on July 27, 2004, eight of LaFauci's claims remained viable: Incidents 3, 4, 5, 7, 8, 9, 10, and 11. Defendants now argue that each of these remaining claims must be rejected. First, defendants urge, LaFauci has failed to exhaust all available administrative remedies as is required by the PLRA, and his claims must

therefore be dismissed.[9]  Alternatively, they submit that: (a) the defendants are entitled to qualified immunity with respect to all of the remaining claims; (b) LaFauci has not alleged sufficient facts to support his claims that the defendants took adverse actions against him to punish him for filing the lawsuit LaFauci v. Brodeur; (c) LaFauci cannot prove his Eighth Amendment claims; and (d) LaFauci is not entitled to recover mental or emotional damages without a showing of physical injury or with merely a showing of *de minimis* injury.

Even assuming, without deciding, that LaFauci properly complied with NHSP's Administrative Grievance procedures and therefore exhausted all available administrative remedies as required by the PLRA, defendants are nevertheless entitled to summary judgment as to the Eighth Amendment and retaliation claims in Incidents 3, 4, 7, 8, 9, 10, and 11.  LaFauci has

---

[9]  Defendants actually make two separate, though related arguments.  First, they contend that LaFauci's claims should be dismissed *with* prejudice because, by failing to comply with the NHSP grievance procedure set forth in PPD 1.16 (eff. Oct. 1, 2002), he failed to exhaust his administrative remedies within 30 days.  Alternatively, defendants argue that LaFauci's claims should be dismissed *without* prejudice because he has not demonstrated that he has yet to exhaust his administrative remedies and therefore has not properly complied with the version of PPD 1.16 that was in effect in 1997 and 1998.

failed to demonstrate the existence of any genuine issue of material fact with respect to these claims. LaFauci has, however, demonstrated that genuine issues of material fact exist as to the Eighth Amendment claim described in Incident 5.

## A.    The Retaliation Claims:  Incidents 3, 5, and 7-11

To prevail on his retaliation claims, LaFauci must show that: (1) he had a First Amendment right; (2) the defendants took adverse action against him; (3) with the intent to retaliate against him for executing his First Amendment rights; and (4) the retaliatory acts caused the injury for which he is seeking compensation. See McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998); Reid v. Brodeur, 2001 WL 274843, *6 (unpublished order)(D.N.H. Feb. 14, 2001).

In the typical case, direct evidence of a retaliatory state of mind is not available to the plaintiff. Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980); McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979). Nevertheless, in some instances, an inference of retaliation may be warranted from the chronology of events recited in the complaint. Id. Such evidence may include temporal proximity between a lawsuit filed against prison officials and allegations of destruction of the inmate's legal

work and unprovoked physical abuse by prison employees.  See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (noting that temporal proximity between inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation); Shabazz v. Cole, 69 F. Supp.2d 177, 197 (D. Mass. 1999)(describing evidence sufficient to infer retaliatory intent).  At the summary judgment stage, however, a bare allegation of temporal proximity ordinarily will not be sufficient by itself to prove improper motivation if the defendant has provided a legitimate explanation for the challenged action.  See Layne v. Vinzant, 657 F.2d 468, 476 (1st Cir. 1981)("[t]he mere chronology alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason" for their conduct); McDonald, 610 F.2d at 18-19.

LaFauci has alleged two classes of retaliatory claims, one based on alleged procedural deficiencies, the other based on substantive violations.  As to each class of claims, defendants contend that they have offered a legitimate, non-retaliatory explanation for the alleged retaliatory acts.  They further argue

that LaFauci has failed to produce sufficient evidence to support his claim that defendants acted with a retaliatory motive.  As I explain with respect to each class of claims, I agree.

### 1. *Retaliation Claims Based Upon Disciplinary Charges and Hearing Procedures*

LaFauci outlines four categories of procedural defects and charges that these defects were in fact retaliatory actions by prison officials.  In particular he alleges that: (1) on three occasions, in Incidents 4, 7, and 9, he was not permitted to call witnesses to disciplinary hearings; (2) on three other occasions, in Incidents 8, 9, and 11, his disciplinary hearings were not recorded or videotaped; (3) once, in Incident 7, a Hearing Officer changed LaFauci's words; and (4) once, in Incident 8, the Hearing Officer "changed the face value of the ticket."

Defendants argue that they are entitled to summary judgment on these retaliation claims because LaFauci has failed to rebut their legitimate, non-retaliatory explanations for their decisions not to allow LaFauci to call witnesses to disciplinary hearings or to have minor disciplinary hearings videotaped or recorded.

It is well-settled that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). Wolff established the standards for adequacy of prison disciplinary procedures. Under Wolff, "a prisoner facing a disciplinary hearing that may result in the loss of a liberty interest must receive '(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action.'" Smith v. Mass. Dep't of Corr., 936 F.2d 1390, 1398 (1st Cir. 1991)(quoting Superintendent Mass. Corr. Inst. v. Hill, 472 U.S. 445, 454 (1985)). The Court later clarified its holding in Wolff, explaining that prison officials bear the burden of justifying the denial of a witness request by offering an explanation, either at the hearing or in connection with subsequent litigation. See Ponte v. Real, 471 U.S. 491, 497-99 (1985). An inmate's right to call witnesses to a disciplinary hearing is therefore qualified, not absolute, as is

-24-

an inmate's right to cross-examine witnesses.  See Wolff, 418 U.S. at 568-69.

In the New Hampshire state prison system, disciplinary hearings are governed by Policy and Procedure Directive ("PPD") 5.25.  See Ex. K, IV. D. to Def.'s Motion for Summ. J. ("Ex."). According to PPD 5.25, inmates who want to call witnesses must provide the Hearing Officer with a list of the witnesses' names at least twenty-four hours before the hearing.  Id.  The Hearing Officer is not required, however, to hear testimony or accept evidence that is "irrelevant, unnecessary, cumulative, or untimely."  Id.  Furthermore, "witnesses may also be excluded for institutional safety or correctional goals."  Id.  The Hearing Officer is permitted, however, to accept offers of proof as evidence.  Id.  If witnesses are excluded, the reasons for the exclusion must be in writing and on the record.  Id.  Finally, under PPD 5.25, only disciplinary hearings involving major offenses ("A" level) are recorded, and the tapes are retained for 6 months.  Id.  Minor disciplinary hearings ("B" and "C" levels) are not recorded.  Id.

a.  *Requests to Call Witnesses to Hearings*

LaFauci asserts that on three occasions he sought to call

witnesses at disciplinary hearings. In Incident 4, however, LaFauci failed to submit a written request with the witnesses' names, in violation of the hearing procedure outlined in PPD 5.25. See Ex. B. In Incident 7, LaFauci properly submitted a request to call Major Guimond as a witness. However, as the record reflects, the Hearing Officer denied his request because Guimond did not witness the incident between LaFauci and officers Hislop and Casey. Because LaFauci did not explain why he requested Major Guimond's testimony, the denial of his request to call Guimond as a witness was not improper. See Ex. C & D. Finally, in Incident 9, LaFauci asked to have inmate Sinhedeth called as a witness. This request was denied because, as Unit Manager Walter Davies explained, Sinhedeth did not speak English well. Instead, Davies interviewed Sinhedeth and took his statement; in this offer of proof Sinhedeth explained that he did not observe any officers verbally harassing LaFauci. See Ex. E. As with Guimond's testimony, Sinhedeth's testimony would not have been relevant and was therefore properly excluded. Thus, because in each instance defendants presented a legitimate, uncontested explanation for their actions and LaFauci has failed to produce any countervailing evidence of retaliatory motive, defendants are

-26-

entitled to summary judgment on LaFauci's claims that they retaliated against him by refusing his requests to call witnesses at disciplinary hearings.

b.    *Request to Videotape or Record Hearing*

Likewise, LaFauci has not demonstrated that defendants' denial of his request to have minor disciplinary hearings recorded or videotaped was improperly motivated.  See Superintendent Mass. Corr. Inst., 472 U.S. at 454; Ex. K, PPD 5.25 IV., D., 8.  Incidents 8, 9, and 11 each involved hearings for minor offenses.  See Ex. E, F, H.  Accordingly, defendants' refusal to videotape or record these hearings was in compliance with the procedures set forth in PPD 5.25.  Without evidence that defendants elected not to record or videotape the hearings in order to punish LaFauci for filing suit against them, these decisions cannot form the basis of a retaliation claim.  I therefore grant defendants' motion for summary judgment as to the retaliation claims based on a failure to record the minor disciplinary hearings in Incidents 8, 9, and 11.

c.    *Remaining Procedural Defects*

LaFauci's remaining procedural claims are equally groundless.  He charges in Incident 7 that at the disciplinary

hearing, the Hearing Officer "changed [LaFauci's] words." LaFauci has not, however, offered any evidence to indicate what he originally said, what alteration the Hearing Officer purportedly made, or what impact this alteration had on the outcome of the hearing. Similarly, in Incident 8 LaFauci claims that the Hearing Officer "changed the face value of the ticket." He appears to claim that he never admitted sarcastically asking C.O. Dragon if he was blind when Dragon ordered him to display his identification badge on his jacket. Again, though, LaFauci has not presented any evidence that the outcome of the hearing, including the guilty finding, would have been different but for this alleged change. I therefore conclude that defendants are entitled to summary judgment on these retaliation claims as well.

### 2. *Substantive Retaliation Claims*

In addition to the retaliation claims based on alleged defects in the disciplinary hearing procedures, LaFauci also claims in Incidents 3, 5, and 7 through 11 that he was harassed, beaten, and abused by a number of prison officials in retaliation for filing the lawsuit, LaFauci v. Brodeur. The defendants do not challenge LaFauci's assertion that he has a First Amendment right to access the courts. Rather, they contend that he cannot

-28-

demonstrate either that adverse actions were taken against him with the intent to retaliate, or that these alleged retaliatory acts caused the injuries for which he now seeks compensation. See McDonald, 132 F.3d at 891-92. Defendants are correct.

Even construing LaFauci's pro se complaint and other filings liberally, as I must, see Estelle v. Gamble, 429 U.S. 97, 106 (1976), he has not recited a chronology of events sufficient to warrant an inference that the conduct of prison officials was motivated by a desire to punish him for filing a lawsuit against them. LaFauci's complaint merely states that the adverse actions taken against him occurred "within days" after he filed his complaint in LaFauci v. Brodeur. The amended complaint in LaFauci v. Brodeur was filed on May 13, 1997, and served on defendants on June 24, 1997 with the Magistrate's report. Yet, only two of the 12 allegedly false and retaliatory disciplinary reports identified in LaFauci's complaint were issued within two weeks of defendants being served with the complaint; the other 10 were issued between two and six months after the complaint was served. This chronology of events thus does not establish a close temporal proximity between the filing of the lawsuit and the adverse actions taken by defendants. See Ferranti, 618 F.2d

-29-

at 892; McDonald, 610 F.2d at 18.

More damaging to LaFauci's claims, though, is his failure to offer any additional evidence that defendants took adverse disciplinary actions with an intent to retaliate. Defendants have submitted evidence that each of the alleged retaliatory disciplinary charges were based on actionable infractions. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)(summary judgment appropriate if defendants show disciplinary action would have been taken even in the absence of inmate's protected conduct); Shabazz, 69 F. Supp.2d at 198 (same). That LaFauci does not believe he was guilty of these infractions is insufficient evidence of retaliation where, as here, credible evidence supports the Hearing Officers' conclusions.

Because there is no genuine issue of material fact as to these claims, I grant summary judgment with respect to LaFauci's retaliation claims as detailed in Incidents 3, 5, and 7 through 11.

B.    **The Eighth Amendment Claims: Incidents 4, 5, and 10**

The crux of LaFauci's allegations in Incidents 4, 5, and 10 is that he was subjected to a nearly constant pattern of unprovoked harassment, abuse, and mistreatment by virtually every

corrections official he encountered.  He specifically complains in Incident 5 and 10, that prison officials intentionally assaulted him and, in Incident 4, put him in a situation where other prisoners could assault him, and that these actions violated the Cruel and Unusual Punishment Clause of the Eighth Amendment.  Defendants counter that LaFauci's allegations of Eighth Amendment violations are no more than "bare allegations," insufficient to survive a motion for summary judgment.  They charge that LaFauci has adduced no evidence to support these claims.

An Eighth Amendment violation in the prison context requires circumstances that are objectively serious, so as to deprive an inmate of the "minimal civilized measures of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981), and a showing that the prison official who caused the deprivation had a sufficiently culpable state of mind."  Wilson v. Seiter, 501 U.S. 294, 297 (1991).

1.    *Incident 4 - Failure to Protect Claim*

LaFauci charges that in Incident 4, prison officials placed him in a housing unit knowing he would immediately be beaten by other inmates.

"The Eighth Amendment imposes 'a duty . . . to protect prisoners from violence at the hands of other prisoners.'" Skinner v. Cunningham, 2003 WL 21994759, *5 (D.N.H. Aug. 20, 2003)(quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994))(unpublished opinion).  That duty requires that prison officials not be "deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners."  Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002)(citing to Farmer, 511 U.S. at 833).  However, not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an Eighth Amendment claim.  Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999).  Two requirements must be met in order for a prison conditions complaint to state a violation of the Eighth Amendment.  Id.  First, the alleged deprivation of adequate conditions must be objectively serious.  "[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Farmer, 511 U.S. at 834.  Second, the prison official involved must have had "a sufficiently culpable state of mind,"  Wilson, 501 U.S. at 299, usually described as deliberate indifference to the inmate's health or safety. Farmer, 511 U.S. at 834.  A prison official manifests

-32-

"deliberate indifference" if he or she knew of, and disregarded an excessive risk to the inmate's health or safety. Id. at 837. LaFauci thus must first establish that defendants knew that when they moved him to the H-Building, they were subjecting him to a substantial risk to his health or safety. See id. at 834; Giroux, 178 F.3d at 32. He then must also establish that, in moving him to the H-Building, defendants failed to respond reasonably to those risks. See Farmer, 511 U.S. at 844; Burrell, 307 F.3d at 8.

LaFauci's failure to protect claim fails under this test because he is unable to produce sufficient evidence to support his contention that defendants acted with a culpable mental state. The only evidence LaFauci has presented on this point is his unsubstantiated assertion that prior to being moved from the South Unit to the H-Building, he asked Lt. Torres why he was being moved, and Torres responded that he would "find out" when he arrived at the H-Building. From this, LaFauci appears to infer that Torres knew LaFauci would be assaulted upon his arrival. He has not produced any evidence, however, that Torres, or any other defendant for that matter, was aware of facts from which they could determine that a serious risk of harm existed

for LaFauci.  Because LaFauci has not demonstrated that any defendant was deliberately indifferent to his health or safety, his claim fails under the second requirement of the Farmer test. I thus grant defendants' motion for summary judgment as to this Eighth Amendment claim.

## 2. *Incident 10 - Cruel and Unusual Punishment Claim*

In Incident 10, LaFauci alleges that several corrections officers roughly handcuffed him and forced him to walk across the prison yard, causing pain and swelling to his knee, and that the following day C.O. Casey forced him to climb several flights of stairs and walk without his crutches, resulting in additional pain and swelling in his knee.  He asserts that these actions, done with malicious intent, were in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Where, as here, prison officials stand accused of using excessive physical force in violation of the Eighth Amendment's prohibition on cruel and unusual punishment, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)(extending Whitley v. Albers, 475 U.S. 312 (1986)).  To prevail, an inmate

-34-

need not demonstrate "significant injury." Id. However, not every "malevolent touch by a prison guard gives rise to a federal cause of action," and *one de minimis* use of physical force is shielded from constitutional scrutiny unless the use of force is not "repugnant to the conscience of mankind." Hudson, 503 U.S. at 9 (internal citations omitted).

Again, LaFauci has failed to present evidence sufficient to warrant the conclusion that prison officials, including C.O. Casey applied force "maliciously or sadistically," so as to cause harm, rather than "in a good faith effort to maintain or restore discipline." Hudson, 503 U.S. at 6-7. In fact, in response to LaFauci's allegations, defendants have presented evidence that LaFauci did not have a medical pass that would permit him to use crutches or excuse him from walking. See Ex. O (Affidavit of Thomas Casey). Moreover, C.O. Casey recalled that because LaFauci complained of pain in his knees, he and C.O. Jordan allowed LaFauci to stop when he needed to and made no attempt to hurry him. Id. Casey explained that they let LaFauci take all the time he needed. Id. The record is thus completely devoid of any evidence that any force used by Casey and Jordan was applied maliciously, sadistically, or was "repugnant to the conscience of

-35-

mankind." Hudson, 503 U.S. at 9. I therefore grant summary judgment on this claim.

### 3. *Incident 5 - Cruel and Unusual Punishment Claim*

Unlike Incident 10, the allegations in Incident 5 require closer scrutiny. Here, LaFauci alleges that several corrections officers took him to the prison's law library, turned off the surveillance camera and savagely beat him, without provocation, both behind the locked doors of the library and later in his cell. As with his other Eighth Amendment claims, defendants argue that they are entitled to summary judgment on Incident 5 because LaFauci failed to present sufficient evidence to demonstrate that he exhausted all available administrative remedies as required by the PLRA. Defendants also argue that LaFauci cannot prove his claim and, in any event, they argue that they are entitled to qualified immunity. I disagree.

#### a. *Exhaustion of Available Administrative Remedies*

As noted above, defendants first move for summary judgment by arguing that LaFauci failed to exhaust administrative remedies available to him through the NHSP grievance system. The PLRA provides in relevant part that "[n]o action shall be brought with

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a)(Supp. 2002).  In <u>Porter v. Nussle</u>, the United States Supreme Court held that "the PLRA exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  534 U.S. 516, 532 (2002); <u>see</u> <u>Medina-Claudio v. Rodriquez-Mateo</u>, 292 F.3d 31, 34 (1st Cir. 2002).

The NHSP provides administrative remedies for inmate claims related to prison conditions.  The prison's remedial scheme requires inmates to first present any complaint that cannot be resolved orally by filing an "inmate request slip."  <u>See</u> <u>LaFauci</u>, No. 99-253-M, 2001 WL 1570932, at *3.  An inmate must then appeal an adverse ruling with respect to an inmate request slip by filing a grievance with the Warden.  <u>See</u> <u>id.</u>  If the inmate is not satisfied with the Warden's response, a final appeal may be filed with the Commissioner.  <u>See</u> <u>id.</u>  Typically, an inmate's complaint is not administratively exhausted until this process, following the "chain of command," has been completed.  There is

an exception to the "chain of command" rule when the inmate believes that he is subject to imminent injury or harm.  Under those circumstances, "the inmate may directly address the Warden or the Commissioner, even if the inmate has not previously filed an inmate request slip."[10]  Id. at *3 n.1 (citing Inmate Manual, section D(3)).

Here, LaFauci filed a grievance form with the Commissioner on July 28, 1997, taking advantage of the emergency procedure.[11]  Pl.'s Ex. N-24.  It was reasonable for LaFauci to address his initial grievance directly to the Commissioner rather than Unit Manager Davies, who witnessed and participated in the assault, as LaFauci could reasonably have believed that addressing an inmate request slip to Davies would have subjected him to additional injury or harm.  In response, the Commissioner's Office directed LaFauci to write to the Warden.  Pl.'s Ex. N-24.  On September 3, 1997, LaFauci sent an inmate request slip to Warden Cunningham, noting the Commissioner's instruction.  Pl.'s Ex. N-26.  In this

---

[10]  It is not clear from the record if a special form must be used to file an emergency grievance.

[11]  The following day, LaFauci sent a letter to the Commissioner's Office, providing additional details of the incident in the law library.  See Pl.'s Ex. N-26.

request slip, LaFauci indicated that he had contacted the Warden's office on several occasions, but had never received an answer. Id. The Warden apparently investigated LaFauci's allegations and on October 6, 1997, informed LaFauci that he was satisfied that his staff had "acted appropriately." Id. Finally, on October 22, 1997, in an effort to properly comply with the administrative grievance procedure, LaFauci sent an inmate request slip to the Unit Supervisor, Sgt. O'Brien. Pl.'s Ex. N-27. In the request slip, LaFauci explained his efforts to comply with the grievance procedure and noted that he had previously contacted O'Brien's office about the incident but had received no reply. Id. Two days later, O'Brien responded by asking LaFauci if he had complied with the grievance system but did not indicate that he had conducted any investigation into the incident. Id.

The record thus demonstrates that LaFauci properly complied with the NHSP grievance system as to this claim, as is required by the PLRA. After being assaulted by the corrections officers on his Unit, he took advantage of the emergency exception and reasonably addressed his grievance to the Commissioner's Office. Then, in compliance with the Commissioner's clear and unambiguous

direction, LaFauci sent an inmate request slip to the Warden, who apparently investigated the allegations and found them groundless.  Finally, in an effort to be sure he properly complied with the system, LaFauci returned to the Unit Supervisor and filed an inmate request slip.  While proper compliance with the grievance system makes sound administrative sense, the procedures themselves, and the directions given to inmates seeking to follow those procedures, should not be traps designed to hamstring legitimate grievances.  I therefore find LaFauci exhausted all available administrative remedies, and proceed to evaluate the merits of his claim.

   b.   *Merits of LaFauci's Cruel and Unusual
        Punishment Claim*

As with Incident 10, LaFauci must demonstrate that force was applied by the corrections officers "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline."  Hudson, 503 U.S. at 6-7.  In making this determination, the U.S. Supreme Court has instructed trial courts to evaluate "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the

responsible officials . . . and any efforts made to temper the severity of a forceful response." Id. at 7 (quoting Whitley, 475 U.S. at 321)(internal quotation marks omitted).

LaFauci claims that when C.O. O'Neil and C.O. Smith took him to the library on July 28, 1997, they confiscated his legal work, and locked him in the library, after which C.O. Morrison tore up some of his legal work while LaFauci watched. At this point, LaFauci claims, he began to call for Unit Manager Davies to come to the library, but C.O. Walters responded first and joined Morrison. Davies was the next to reach the library, and as LaFauci tried to explain Morrison's actions, several other corrections officers arrived, entered the library, and brutally assaulted him. According to the incident reports from the corrections officers, LaFauci was being disruptive in the library and they needed to use force to subdue him. Not surprisingly, none of their reports include an account of C.O. Morrison's actions. The incident reports also indicate that LaFauci refused several orders to turn around and kneel down. LaFauci denies refusing the order and instead alleges that as he was kneeling down, C.O. O'Neil rushed at him and knocked him to the floor.

There exists, then, a genuine dispute as to the following material facts:  the cause of the disturbance in the library; the threat reasonably perceived by the officers; the need for six corrections officers to apply force; and any efforts made to temper the severity of the forceful response.  See Whitley, 475 U.S. at 321.  LaFauci has thus presented sufficient evidence to permit a trial on his claim that the corrections officers acted "maliciously or sadistically for the very purpose of causing harm."  Hudson, 503 U.S. at 6.  I therefore deny defendants' motion for summary judgment on this claim.

## V.  CONCLUSION

For the foregoing reasons, I grant defendants' motion for summary judgment (Doc. No. 123) as to all claims in Incidents 3, 4, 7, 8, 9, 10, and 11, and deny it as to Incident 5.  The only remaining defendants therefore are those involved in Incident 5: Eric Denis, Neil Smith, Shawn O'Neil, Christopher Walters, Walter Davies, Shelton Fitton, and Lee Morrison.

I also deny LaFauci's motion for internal investigation reports (Doc. No. 265) and his motion to strike defendants' motion for summary judgment (Doc. No. 264).

-42-

This Memorandum and Order renders moot defendants' motion for clarification and enlargement of time (Doc. No. 267) as well as their motion for enlargement of time from November 17, 2004 to December 3, 2004 (Doc. No. 268).  The clerk shall enter judgment accordingly.

SO ORDERED.


_____
Paul Barbadoro
United States District Judge

February 23, 2005

cc:  Anthony LaFauci, *pro se*
     Mary E. Schwarzer, Esq.